Filed 1/30/14

# IN THE SUPREME COURT OF CALIFORNIA

| THE PEOPLE, | ) | |
|---|---|---|
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S105097 |
| v. | ) | |
| | ) | |
| DEWEY JOE DUFF, | ) | |
| | ) | Sacramento County |
| Defendant and Appellant. | ) | Super. Ct. No. 98F01583 |
| _____ | ) | |

A jury convicted defendant Dewey Joe Duff of two counts of first degree murder with robbery and multiple-murder special circumstances, as well as various lesser crimes, for the 1998 killings of Roscoe Riley and Brandon Hagan. (Pen. Code, §§ 187, 189, 190.2, subd. (a)(3), (17).)[1] It thereafter returned a death verdict. On automatic appeal, we affirm the judgment in its entirety.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. GUILT PHASE TRIAL

It is undisputed that on February 23, 1998, Duff shot and killed Riley and Hagan. The principal issue during the guilt phase was why: Whether, as the People argued, Duff acted with premeditation to settle a grudge against Riley, or whether, as Duff argued, he acted in self-defense after Riley and Hagan pointed three guns at him and opened fire.

_____

[1] All further unlabeled statutory references are to the Penal Code.

1. *Prosecution Evidence*

On the afternoon of February 23, 1998, bartender Diana Flint and customer Filomeno Lujan witnessed shootings in the parking lot outside Taylor's Corner Bar in Sacramento. Flint saw a man enter the bar, use the restroom, and leave. Minutes later, Flint heard a gunshot and through a window saw the man standing next to the rear passenger side of a car in the parking lot, shooting into the car. The car's doors were closed. The man then walked around the car, pushed something out of the driver's seat, and drove off. Hearing shots, Lujan ran first to a window and then outside and saw two people, later determined to be Roscoe Riley and Brandon Hagan, slumped over in the front seats; he saw a third man with a gun take another gun from the motionless driver, climb into the driver's seat, and drive off. Moments later, as the car was driving away, Flint and Lujan both heard a further shot. Flint called 911.

That night, police seeking a suspect on an unrelated warrant spotted Duff fleeing on foot near where he lived. Thinking he might be the suspect they were seeking, officers pursued him and eventually, after a brief struggle, arrested him. An officer recognized Duff and, knowing that he had until recently lived across the street with his mother, obtained consent from Duff's mother to search her house. When .22-caliber bullets were found, Duff was held on charges of being a felon in position of ammunition. When arrested, Duff had in his possession two of Riley's rings. A search of the area where Duff was arrested produced a .357-caliber revolver with blood in its chambers and a matching gun holster.[2]

Police received a tip concerning a car with bodies in it parked in a muddy field behind the house of Sheri Sanchez and Walter Payne, friends with whom

---

[2] Duff later confirmed the .357 was a gun he had taken from Riley.

2

Duff sometimes lived. Police found the car with Riley's and Hagan's bodies inside and had the car towed to a crime laboratory for inspection.

After discovering Riley's and Hagan's bodies, police questioned Duff about the shootings. In a taped interview played for the jury, he confessed to killing both men. He explained that he had set up a deal with Riley to trade guns for drugs; they were on their way from Sacramento to Rio Linda to secure the drugs when Duff asked for a restroom stop. Duff had met Hagan, who was accompanying Riley, only once before. When Duff returned to the car, Riley pointed one gun and Hagan two guns at him, and they demanded his guns and money. Duff said he did not want trouble and was getting out of the car, someone fired a shot, and as Duff was getting out he returned fire with a .38. He then ran to the driver's side, pushed Riley aside, and drove off. One of the men was still alive, so Duff shot him again as he was driving away. Duff took jewelry, a .357, and other guns from the men.

Forensic examination of the bodies and car revealed that Riley had been shot four times and Hagan twice. Each had been shot with both a .357 and a .38. All bullets recovered were .38-caliber but could be fired from either a .38 or a .357. There were no bullet holes in the back of the car or any other evidence that would suggest a gun had been fired from the front seat toward the rear. Riley was wearing an elastic strap that could have been part of a gun holster. Hagan had dice in his lap, as if the men had been playing a game when they were shot. Expert reconstruction of the scene suggested both Riley and Hagan had been shot from behind with the .38 and from the side with the .357.

Duff's friend Cynthia Fernando, who was staying with Duff at the Sanchez/Payne house, testified that Duff had sold Riley a .357 for $100 or its equivalent in methamphetamine and was very angry because Riley never paid him and had ignored and "disrespected" him. In the month or two preceding the

3

shootings, Duff repeatedly discussed setting up Riley by agreeing to meet him to do a drug deal but then robbing him of drugs and jewelry and killing him. In the days before the murders, Fernando saw Duff with multiple guns, including a .38, and saw him taking shooting practice.[3]

One day when Duff was at another friend's house, he spoke to Fernando on the phone and asked her to come over. When she arrived, Duff had showered and was trying on clean clothes; his clothes were folded in a box he intended to bury. She saw him wipe blood off a .357. Duff said he had killed two people, including one who was not supposed to be there. He never mentioned that either man had pulled a gun or that he had acted in self-defense. The bodies were in a car in back of the Sanchez/Payne house.

Fernando and Duff soon met up with his friend Ronald Greathouse, and Duff gave Greathouse a few items. Duff gave Fernando the methamphetamine he had taken from the victims. She also saw other items from the car, including jewelry, a cell phone, and numerous guns, including Duff's .38 and the .357 Duff had sold Riley. Duff kept the .357 and Fernando took the jewelry and other guns, including the .38, with directions that the .38 go to Duff's half brother. That night, as they were walking toward Duff's mother's house with the guns and with items from the robbery in a shopping cart, Duff spotted police officers and took off without a word. The next day, Fernando gave the .38 and another gun to Duff's half brother.

Ronald Greathouse testified that, in the weeks before the murders, Duff had asked for help robbing a man named Roscoe and Roscoe's friend and shooting one of them in the buttocks. Duff was going to set up a deal for drugs and jewelry and

---

**3**      Another witness also saw a man matching Duff's description taking target practice in the backyard of the Sanchez/Payne house the day before the shootings.

then rob Roscoe because he was "lame and easy to do." Duff had a .38-caliber gun with him. Weeks after that first conversation, Duff gave Greathouse a ring and five spent .357- or .38-caliber shell casings and had Greathouse sell the ring, splitting the profits, and dispose of the shells so no one would find them.

Lloyd Dunham, a friend of Duff's half brother, testified that Duff was angry with Riley because Duff had set up a guns-for-drugs deal for Riley but had not received anything. Duff had asked Dunham for help in setting up a fake drug buy from Riley with the intent of then robbing Riley of his drugs, money, and jewelry.

Duff's nephew, Lloyd Duff, told police that the week before the murders Duff said he planned to set someone up, rob them, and "leave no witnesses."

### 2. *Defense Evidence*

Duff did not testify, relying on his taped confession to convey his version of events. The defense called only one witness, Detective Toni Winfield, to impeach Fernando with statements she had made to Detective Winfield before trial, including that Duff had led her to believe the second victim was a woman and that she had not seen him wipe blood off the .357.

### B. PENALTY PHASE TRIAL

#### 1. *Prosecution Evidence*

In addition to the circumstances of the crime, the People relied principally on Duff's history of prior violent criminal acts, including eight felony convictions and other malfeasance not leading to a conviction. (§ 190.3, factors (b), (c).) In the 20 years preceding the murders, Duff had been convicted of false imprisonment, assault of a police officer, assault with a semi-automatic rifle, possessing methamphetamine (twice), theft, vehicle theft, and possessing a dagger.

5

The false imprisonment victim testified that when she was 16, Duff grabbed her from behind and dragged her toward an alley. She struggled and screamed; when someone heard the screams, Duff released her and she fled.

A woman testified to an uncharged incident in which Duff exposed himself and masturbated toward her while she was sitting in the passenger seat of a car at a drive-in restaurant, grabbed the breasts of two other women walking by, then stuck his erect penis through the driver's side window at the witness's female companion.

The officer who had been assaulted testified that Duff slipped a handcuff and hit him. In the ensuing struggle, the officer tore ligaments in his hand and hit his head on a telephone pole.

Another woman testified that Duff, shirtless, entered her home with a loaded sawed-off rifle. She, her husband, and six children escaped the house and called police, who caught Duff. Earlier that same night, Duff had approached three teenagers, cocked the rifle, and pointed it at them.

In a partially uncharged incident, a woman testified that late one night, while she was at a closed gas station going through mail she had stolen, Duff approached her and struck up a conversation. When she started to leave, he hit her in the head from behind. When she tried to run, he grabbed her by the hair, held a knife to her throat, forced her to orally copulate him, and then raped her. When police responded to a call regarding the rape, Duff drove off but crashed; he was found in possession of a bayonet-style dagger. The woman admitted that she had originally lied about some aspects of the incident, including by claiming that Duff had forced her to take methamphetamine and that she was returning from bingo, not out stealing mail. Pursuant to a plea bargain, rape charges were dropped, but Duff pleaded guilty to possession of a dagger.

In another incident, Duff shot at his friend Ronald Greathouse, grazing his head. The night before the murders, he beat Cynthia Fernando extensively, knocking her to the ground at least four times, kicking her, picking her up to beat her again, and breaking her ribs.

The prosecution concluded with brief victim impact evidence from Marie Correa, the mother of two daughters by Riley, and Makala Tiller, a friend of Hagan's.

### 2. *Defense Evidence*

Duff introduced evidence that he had been raised in a dysfunctional home. Duff's mother had given birth to six living children and had had six or seven additional miscarriages or stillbirths. She was married at least four and possibly as many as eight times, though never to Duff's father, whose identity was unknown. Duff fell on his head when he was three and was "slower" thereafter. Duff's mother was an alcoholic, and there was domestic violence in the home, some of it directed toward Duff, from both his mother and stepfathers. Duff's mother used her children to help her lure men to her home and then rob them. Duff's mother and family members were involved in distributing drugs.

Duff was married for 10 years and had three daughters.

Defense experts testified that Duff had low intelligence (an overall I.Q. of 87 and individual I.Q.'s in various areas of between 62 and 99), a learning disability, and mild brain damage that caused learning and attention difficulties.

### C. PROCEDURAL HISTORY

Duff was charged with two counts of first degree murder with two special circumstances for each count, murder during the commission of robbery and multiple murder. (§§ 187, 189, 190.2, subd. (a)(3), (17).) He was also charged with robbery (§ 211), possession by a felon of a handgun and reloadable

7

ammunition (former § 12021, subd. (a) [now § 29800]; former § 12316, subd. (b)(1) [now § 30305, subd. (a)]), firearm-use enhancements (§ 12022.53), and a prior serious felony conviction qualifying as a strike (§§ 245, subd. (b), 667, subds. (a)-(i), 667.5, subd. (b), 1170.12). Before trial, the court dismissed the reloadable ammunition count on the prosecution's motion.

A jury convicted Duff on both first degree murder counts and found the special circumstances true. It also convicted Duff of all remaining lesser offenses and found the firearm-use enhancements true. Duff admitted the strike. At the penalty phase, the jury returned a verdict of death.

## II. DISCUSSION

### A. JURY SELECTION ISSUES

#### 1. Excusals Pursuant to Stipulation

In the course of voir dire, the trial court permitted counsel for both sides to prescreen juror questionnaires and arrive at stipulations as to particular jurors they mutually agreed were unsuitable. Under this procedure, Duff and the prosecution stipulated to the exclusion of numerous prospective jurors, including jury pool members C.L., S.K., and D.L., and the trial court accepted these stipulations. Duff now contends the trial court committed error by excusing these three jurors under *Witherspoon v. Illinois* (1968) 391 U.S. 510 (*Witherspoon*) and *Wainwright v. Witt* (1985) 469 U.S. 412 (*Witt*)[4] without adequate voir dire into their views on the death penalty.

---

[4] Under *Witherspoon*, *supra*, 391 U.S. 510 and *Witt*, *supra*, 469 U.S. 412, prospective jurors may be excused for cause based on their views on the death penalty if the jurors' attitudes will prevent or substantially impair the performance of their duties as jurors in accordance with their instructions and oath. (*People v. Wilson* (2008) 44 Cal.4th 758, 786.)

This contention is misguided. The trial court did not dismiss these prospective jurors on *Witherspoon-Witt* grounds; it did not dismiss them on any particular ground or make findings as to the basis for their dismissal, but instead accepted the parties' stipulation that the jurors be dismissed. Nothing in the record suggests these jurors' views of the death penalty played any role in their dismissal. Indeed, the court anticipated there would be stipulations wholly unrelated to *Witherspoon-Witt* concerns; while explaining that the plan for voir dire was to focus questioning on the death penalty, the court noted: "I would not be at all surprised if counsel collaborate on stipulating to excuse people who have issues that preclude them from being fair to both sides in this case that have nothing to do with the penalty discussion."

A court may allow counsel to prescreen juror questionnaires and stipulate to juror dismissals. (*People v. Booker* (2011) 51 Cal.4th 141, 159-161; *People v. Benavides* (2005) 35 Cal.4th 69, 88-89; *People v. Ervin* (2000) 22 Cal.4th 48, 72-73.) When prospective jurors are formally dismissed pursuant to stipulation rather than cause, the trial court makes no findings, and we have nothing we can review. (*Booker*, at p. 161.) Consequently, a stipulation to the excusal of jurors forfeits any subsequent objection to their omission from the jury pool. (*Id.* at p. 159; *Benavides*, at pp. 87-88; *Ervin*, at p. 73.)

Duff argues that because the court made no findings, we do not know why each juror was objectionable. Next, he concludes that in the absence of findings, we must assume *Witherspoon-Witt* concerns underlay each dismissal, and he argues such concerns are not borne out by the jurors' questionnaires. While it is true that the trial court made no findings, the conclusion does not follow. As the trial court recognized, any number of reasons unrelated to a prospective juror's views on the death penalty might lead both sides to conclude the juror is unsuitable or otherwise subject to excusal. (See Code Civ. Proc., §§ 204,

9

subd. (b), 225, subd. (b)(1), 228, 229.)[5]  The absence of a record, attributable to Duff's stipulation to each dismissal, precludes us from speculating and entertaining Duff's claim on appeal.

2.  *Excusal for Cause:* Witherspoon-Witt

In the course of voir dire, the trial court granted over Duff's objection the prosecution's motion to excuse Prospective Juror S.L. for cause on *Witherspoon-Witt* grounds.  Duff renews his objection on appeal, arguing the excusal of S.L. violated his rights under *Witherspoon*, *supra*, 391 U.S. 510, *Witt*, *supra*, 469 U.S. 412, and their progeny.  In an essentially related argument, he contends that his equal protection rights were violated because Juror S.L. was excused on account of her religious beliefs.

"Under both the state and federal Constitutions, a criminal defendant is guaranteed the right to be tried by an impartial jury.  (Cal. Const., art. I, § 16; U.S. Const., 6th & 14th Amends.)  A prospective juror may be excused for cause only if his or her views in favor of or against capital punishment 'would "prevent or substantially impair the performance of his [or her] duties as a juror in accordance with [the court's] instructions and [the juror's oath]." '  (*Witt*, *supra*, 469 U.S. at p. 424; see *Uttecht v. Brown* (2007) 551 U.S. 1, 9.)  Although opposition to the death penalty does not necessarily afford a basis for excusing a juror for cause (*People v. Martinez* (2009) 47 Cal.4th 399, 425), the prosecutor may properly challenge those prospective jurors whose opposition to the death penalty 'would not allow them to view the proceedings impartially, and who therefore might

---

**5**     Indeed, when Prospective Juror D.L. was excused by stipulation at the same time as two other jurors, the trial court noted that different unspecified reasons lay behind the excusal of each juror.

10

frustrate administration of [the] death penalty scheme.' (*Witt*, *supra*, at p. 416.)" (*People v. Clark* (2011) 52 Cal.4th 856, 895.)

On appeal, we consider whether the trial court's ruling is fairly supported by the record. (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1328; *People v. Pearson* (2012) 53 Cal.4th 306, 327.) "When the prospective juror's answers on voir dire are conflicting or equivocal, the trial court's findings as to the prospective juror's state of mind are binding on appellate courts if supported by substantial evidence." (*People v. Duenas* (2012) 55 Cal.4th 1, 10.) " 'Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors.' " (*McKinzie*, at p. 1329, quoting *Uttecht v. Brown*, *supra*, 551 U.S. at p. 9.)

Juror S.L.'s questionnaire revealed someone profoundly conflicted as to whether she could ever personally vote to impose the death penalty. She checked that she could give honest consideration to both life and death and circled that she was only "Somewhat Opposed" to the death penalty. But she also wrote, "I am Catholic and I do not believe I could send someone to their death" and "I'm just not sure if I could live with myself if I had to send someone to their death." Numerous other answers elaborated on the internal tension she felt. (E.g., "I feel [the] death penalty is a deterrent, I understand why it is necessary. But I also believe that only God has the right to take away life. It is a conflict in my life that I have not yet been able to resolve. I err on the side of God."; "I understand why it works as a deterrent so I can't oppose it (as I know I should). But I cannot condone it as it is not what I believe God would want us to do.") Answering whether her views would always cause her to vote against the death penalty, she checked "Yes," then crossed that out, checked "No," and explained: "I would

11

follow the law, I would not intentionally break the law, but I am not sure I could live with it."

She clarified that the tension she experienced was personal, and not because she felt obligated to follow her church's or anyone else's views; although religion was for her "100% of my life" and the death penalty was "against the Catholic beliefs," she felt "this way because of what I have read about God in the Bible, not because the Church says so."  In that vein, she noted, "My husband is strongly in favor [of the death penalty] but I follow my own path, God holds <u>me</u> accountable for my acts.  I must decide what is correct for myself."

Presented with a questionnaire that left it ultimately unclear whether the prospective juror would be able to be guided by the court's instructions as opposed to her personal views, the trial court and counsel appropriately conducted a lengthy voir dire to ascertain the precise nature of the juror's sentiments.  (Cf. *People v. Riccardi* (2012) 54 Cal.4th 758, 782 [court committed reversible error by failing to conduct voir dire before excusing on *Witherspoon-Witt* grounds a juror with ambiguous questionnaire answers].)  As the court explored her views, S.L. repeatedly avowed that while she would try to do what the law asked of her notwithstanding her religious beliefs, she was unsure whether she "could separate—completely separate those beliefs from me and my decision making because that's what has influenced all of my decisions all of my life."  (See also, e.g., "I don't know that [my religious beliefs] would not influence me.  It's been my whole life.  I mean my—my belief—it's my whole life.  So I don't know that it would not influence me.  [¶] I wouldn't try—I would try not to allow that to influence me.  [¶] But I've never been in a position where I have to make that kind of a decision before.  I don't know.  [¶] I mean I can't say 100 percent that never—it would never influence me at all.  [¶] It's not something that I have ever had to separate from my life before.")

12

Questioned by defense counsel as to whether she could vote for death if the aggravating circumstances outweighed the mitigating circumstances, S.L. offered, "I think that if it was—like you said it would have to be something that would be so completely—I could—I'm not sure how well I would live with myself after that. [¶] But I think that I could. That's my job and my responsibility to do that." Asked if she could vote for death even though it was personally unpleasant, she indicated, "I believe so, yes."

After confirming to the prosecution that she thought it wrong to put someone to death, S.L. was asked how it could ever be right to vote to put someone to death: "Truthfully I don't know. [¶] I've never faced this before. I've never been in a position to have to do that before. [¶] I—I could only tell you that I would do the best that I could do if I was put in this position." After agreeing that the right thing to do would be to always vote for life, she explained, "I guess basically my conflict resides in that doing the right thing could mean not doing something correct in the law. [¶] I don't know." Moments later, after agreeing that voting for death would "be directly violating what God told you not to do," S.L. offered, "*I do think it would be wrong for me to sit on the jury.* [¶] It is just because I don't think that—I know what I'm capable of doing. I don't know that I would 100 percent be capable of doing this." The prosecutor asked if S.L. "could not really live with yourself if you actually vote for the death penalty?" and S.L. replied, "Yeah. [¶] That's true."

Thereafter, the trial court considered the prosecution's motion to excuse S.L. for cause and concluded the juror had made clear she was "not open minded" and that while she thought "she might be able" to reach a death verdict, "she doesn't know how she could live with that decision" and "articulated that this is not something she should do." Accordingly, the court found S.L. "substantially impaired" and excused her from the jury.

13

Juror S.L.'s questionnaire and responses to voir dire reveal a deep-seated internal conflict as to whether she could set aside her profound devotion to the perceived dictates of her religious faith in order to follow the court's instructions and render a verdict of life or death based on the evidence before her. She made clear that she certainly desired to follow the law, but in the end could not shake substantial doubts that she would be able to do so. The record also makes apparent that the trial court ultimately excused her not because of her religious affiliation, but because in its judgment, after viewing her responses to its own questions and those of counsel, the prospective juror would be substantially impaired in her ability to follow the court's instructions and fulfill her duties as a juror. (See *Witt*, *supra*, 469 U.S. at p. 424; *People v. Rountree* (2013) 56 Cal.4th 823, 847 [The "trial court did not excuse [the juror] because he belonged to any particular religious denomination, or even because he had any particular religious beliefs. Rather it excused him because he made it clear that his beliefs would have substantially impaired the performance of his duties as a juror. Prospective jurors whose beliefs—whether religiously or otherwise based—prevent them from impartially performing the duties of a juror, which includes deciding the case impartially and, ultimately, sitting in judgment, may be excused for cause."].)

The uncertainty S.L. displayed about her own ability to actually vote for death exceeded that reflected in the record in any number of recent cases where we have upheld excusals for cause based on the effect a juror's religious beliefs would have on her or his ability to act. (See, e.g., *People v. Rountree*, *supra*, 56 Cal.4th at p. 847 [the "juror could hardly have been more equivocal about whether he could set aside his religious convictions and perform a juror's duties"]; *People v. Jones* (2012) 54 Cal.4th 1, 43 ["equivocal and conflicting" answers "indicated that [the prospective juror] harbored very serious doubts concerning whether, if seated on a capital jury, she could ever personally vote to impose the death penalty" and

14

supported the trial court's conclusion that her religious beliefs would substantially impair the performance of her duties]; *People v. Cowan* (2010) 50 Cal.4th 401, 441 [the trial court is in the best position to determine whether a juror uncertain about her ability to impose death because "punishment was for God alone" can serve or would be substantially impaired].) As in these cases, substantial evidence supports the trial court's assessment that a juror deeply conflicted about her ability to follow the court's instructions and disregard her personal belief that it would never be right for mortals to put someone to death is substantially impaired, and we accordingly defer to that determination.

### 3. Wheeler-Batson *Motion*

During jury selection, the prosecution at one point used three consecutive peremptory challenges on African-American prospective jurors. Duff challenged this exercise of peremptories as race-based. The trial court ruled Duff had not made out a prima facie case of discrimination but invited the prosecutor to make a record of his reasons, and the prosecutor did so. Thereafter, the trial court denied Duff's motion. The jury as seated included no African-Americans.[6] Duff renews his objection on appeal. We find no error.

### a. Legal Principles

The federal Constitution, state Constitution, and state statutory law all prohibit the use of peremptory challenges to exclude prospective jurors based on race. (*Batson v. Kentucky* (1986) 476 U.S. 79, 97; *People v. Wheeler* (1978) 22 Cal.3d 258, 276 (*Wheeler*); Code Civ. Proc., § 231.5.) "The prosecution's use of peremptory challenges to remove prospective jurors based on group bias, such as

---

[6] Duff is Caucasian. Hagan was also Caucasian. Riley was African-American.

15

race or ethnicity, violates a defendant's right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution and his right to equal protection under the Fourteenth Amendment to the United States Constitution." (*People v. Blacksher* (2011) 52 Cal.4th 769, 801.)

" 'There is a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination.' " (*People v. Dement* (2011) 53 Cal.4th 1, 19; see also *Purkett v. Elem* (1995) 514 U.S. 765, 768.) Under a now-familiar three-step process, to carry this burden a defendant must first "make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citation.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]" (*Johnson v. California* (2005) 545 U.S. 162, 168, fn. omitted.) The same rules apply to state constitutional claims. (*People v. Taylor* (2009) 47 Cal.4th 850, 886.)

Here, although the trial court found no prima facie case had been made out, it permitted the prosecutor to make a complete record of his reasons as to each of the three challenges. Consequently, as in *People v. Cowan*, *supra*, 50 Cal.4th 401, we may "assume without deciding that defendant established a prima facie case by pointing out that the prosecutor used three of the 18 peremptory challenges she exercised to strike all of the African-American prospective jurors called to the jury box, resulting in no African-Americans serving on defendant's jury" (*id.* at pp. 447-448) and directly "proceed to the second and third steps of the

16

*Batson/Wheeler* analysis" (*id.* at p. 448; see also *People v. Mai* (2013) 57 Cal.4th 986, 1050; *People v. Elliott* (2012) 53 Cal.4th 535, 560-561; *People v. Thomas* (2011) 51 Cal.4th 449, 474).  The key question at this juncture is how persuasive the prosecutor's proffered justifications are, considering, inter alia, their inherent plausibility and their relation to accepted trial strategy considerations.  (*Miller-El v. Cockrell* (2003) 537 U.S. 322, 338-339; *Cowan*, at p. 448.)  For each of the three excused jurors, we conclude the prosecutor's stated reasons are fully supported by the record and are plausible, nondiscriminatory bases for exercising a peremptory.  (See *Mai*, at pp. 1050-1054; *Cowan*, at p. 448; *People v. Zambrano* (2007) 41 Cal.4th 1082, 1106.)

                b.   Prospective Juror T.T.

The prosecutor offered four reasons for excusing Prospective Juror T.T. First, his brother had just been released after six years in prison.  Second, T.T. was uncertain as to whether the People should have a higher burden of proof in a murder case.  Third, T.T. came across during voir dire as "incredibly timid," "probably the quietest person that we interviewed.  He was very quiet, and I characterized him as being timid," and "seemed scared" about the possibility of having to vote on the death penalty.  Fourth, the prosecutor observed the prospective juror apparently sleeping in the hallway outside the courtroom with sunglasses on, and was concerned about how he would fit in with other jurors.

The record supports the first three of these reasons that are rooted in T.T.'s questionnaire or voir dire responses.  T.T.'s brother had in fact just been released after an apparent six-year prison sentence, and we have routinely recognized a prospective juror's family's negative experience with the justice system as a legitimate potential reason to want to excuse a juror (e.g., *People v. Booker*, *supra*, 51 Cal.4th at p. 167, fn. 13; *People v. Bonilla* (2007) 41 Cal.4th 313, 343; *People*

17

*v. Avila* (2006) 38 Cal.4th 491, 554-555). In his questionnaire, T.T. was unsure whether the People should face a higher standard of proof in murder cases, and in voir dire he indicated the People should have to prove guilt "without a reasonable shadow of a doubt" (see *People v. Mills* (2010) 48 Cal.4th 158, 176-177 [legitimate for prosecutor to want to excuse juror who may wish to impose higher standard of proof]). In his questionnaire, T.T. described himself as a "Follower[.] I just don't like the responsibility . . . ." and "kind of scared at the possible thought of" the death penalty. During voir dire, he described himself as a "little nervous" about the prospect of being on the jury and at another point dropped his voice so low counsel had to ask him to repeat himself. We have recognized that prosecutors may legitimately choose to shy away from followers or unduly timid jurors. (*People v. Ledesma* (2006) 39 Cal.4th 641, 679; *People v. Johnson* (1989) 47 Cal.3d 1194, 1220.)

c.  Prospective Juror L.T.

The prosecutor described Prospective Juror L.T.'s questionnaire answers as jumping out as "unusual." He believed the juror had been significantly late to court one day, and was bothered that L.T. thought lawyers made too much money, that he was overly eager to be on the jury, that his mannerisms seemed unusual, and that he pressed the bailiff with a wealth of questions, giving rise to concern that he would be a potential annoyance or problem juror. The trial court thought the record "quite clear" as to reasons one might want to excuse L.T., even before the prosecutor put his justifications on the record.

The prosecutor did not identify particular questionnaire answers he thought unusual. Among those that might have stood out, L.T. disclosed he had been arrested for driving with a suspended license and was not happy about being fined and losing his car. Prosecutors and defense attorneys were necessary "but make

18

way too much money," a view he confirmed on voir dire, adding that as a result "not everyone is given the same access to the resource." Victim impact evidence was in his mind irrelevant because the "crime wasn't necessarily against the family."

On voir dire, asked about the prospect of being a juror, L.T. replied, "To be honest I'm actually kind of looking forward to it. [¶] I've wanted to be in jury duty for some time now, and I feel that it's the perfect thing here. The first time around I get a case where I get to really get involved in and understand the legal system a little more. So I welcome the chance." The record does not confirm whether L.T. frequently questioned court staff, but he did interrupt jury selection to ask how many peremptories the parties got just moments before he himself was excused.[7]

The reasons that can be confirmed in the record are plausible nonpretextual grounds for choosing to excuse a juror. (See, e.g., *People v. Thompson* (2010) 49 Cal.4th 79, 108-109 [upholding excusal of prospective juror for, inter alia, being too eager to be on a jury]; *People v. Ervin*, *supra*, 22 Cal.4th at pp. 76-77 [same].) The prosecutor could reasonably be concerned that L.T. would not consider penalty phase victim impact evidence and that he might feel hostility toward one or both side's attorneys that would color his deliberations. "[T]he law recognizes that a peremptory challenge may be predicated on a broad spectrum of evidence suggestive of juror partiality. The evidence may range from the obviously serious to the apparently trivial, from the virtually certain to the highly speculative." (*Wheeler*, *supra*, 22 Cal.3d at p. 275; see also *People v. Lenix* (2008) 44 Cal.4th

---

[7] The question, coming at the very tail of the selection process, was apparently posed with some impatience, because the trial court rejoined, "Mr. [T.], there is an end."

19

602, 613 [" '[E]ven a "trivial" reason, if genuine and neutral, will suffice.' [Citation.] A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons."].)

### d. Prospective Juror T.M.

The prosecutor identified three concerns about Prospective Juror T.M. First, she indicated on her questionnaire that she had seen police brutality. As the prosecutor noted, during various points in Duff's interrogation and subsequent calls to his mother and girlfriend, Duff complained that he had been beaten up and hurt by the police officers who arrested him. The prosecutor was concerned that, given T.M.'s past experience, she might be more open to an argument that Duff's confession was involuntary or a product of police brutality.

Second, asked whether a person's background and upbringing can affect his or her adult life, T.M. indicated on her questionnaire, "People generally are products of their environment." The prosecutor explained that Duff's penalty phase argument was likely to focus heavily on the contention that Duff "is, in fact, a product of his own environment, that he was—that he was mistreated when he was younger, that he had a bad childhood, and that it's no wonder that he ended up in the place he is. [¶] And I think that kind of an argument, just from my reading of the questionnaire and watching [T.M.], listening to the answers she gave in court, I think she is going to be more susceptible to that kind of an argument."

Finally, the prosecutor noted that T.M. had failed to show up for the final day of jury selection, the day she was peremptorily challenged and the court heard the *Wheeler-Batson* motion. The prosecutor could reasonably be concerned that future tardiness or absences might delay trial proceedings. The other two proffered reasons—susceptibility to an argument that Duff's confession was in part due to police brutality and to an argument that Duff was simply a product of

20

his environment and thus his culpability was mitigated—are likewise wholly plausible and firmly grounded in acceptable trial strategy considerations.[8] Duff thus has not carried his burden of showing the prosecutor's justifications for exercising peremptories were a pretext for invidious racial discrimination. (See *People v. Taylor*, *supra*, 47 Cal.4th at p. 891 [defendant's burden is to show discrimination, not just that one or more nondiscriminatory reasons are unsupported by the record].)

### B. GUILT PHASE ISSUES

#### 1. *Disposal of the Car in Which the Victims Were Shot*

Riley's and Hagan's bodies were found in a hatchback car stolen from a third party. Police used a superglue process to test the interior for fingerprints and, because that procedure involved toxic chemicals, purchased the car from the owner rather than returning it to her. The interior was photographed and videotaped and then, in accordance with standard procedures for cars subjected to the superglue process, the car was towed away in March 1998 with the expectation it would be crushed. The car was still in a salvage yard in September 1998, but was apparently destroyed sometime thereafter.

In October 2001, because his expert was no longer able to examine and test the car, Duff brought a motion for sanctions for the spoliation of evidence. He argued that the state had breached its duty to preserve exculpatory evidence and

_____

[8] We note as well that on the morning of the final day of jury selection, when T.M. failed to appear, the trial court offered the parties a choice between recessing for the day, pressing on with a placeholder in T.M.'s seat to indicate her continuing provisional inclusion on the jury, or summary dismissal of T.M. Had the prosecution been looking for any pretextual excuse to dismiss T.M., it could have availed itself of the opportunity to lobby for her summary dismissal at that point. The prosecution did not, electing instead to carry on with a placeholder, until it ultimately exercised one of its peremptories to excuse T.M.

thus violated his due process rights. (See *California v. Trombetta* (1984) 467 U.S. 479, 488-489 (*Trombetta*).) The trial court concluded that because it was extremely unlikely anything of exculpatory value had been lost and Duff had not shown the car's destruction was an act of bad faith, no sanctions were warranted. We review the trial court's denial of Duff's *Trombetta* motion for substantial evidence (*People v. Carter* (2005) 36 Cal.4th 1215, 1246) and find no error.

"Due process does not impose upon law enforcement 'an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution.' " (*People v. Wallace* (2008) 44 Cal.4th 1032, 1083, quoting *Arizona v. Youngblood* (1988) 488 U.S. 51, 58.) At most, the state's obligation to preserve evidence extends to "evidence that might be expected to play a significant role in the suspect's defense." (*Trombetta*, *supra*, 467 U.S. at p. 488; accord, *People v. Alexander* (2010) 49 Cal.4th 846, 878.) If the evidence's exculpatory value is apparent and no comparable evidence is reasonably available, due process precludes the state from destroying it. (*Trombetta*, at p. 489; *Alexander*, at p. 878.) If, however, "no more can be said [of the evidence] than that it *could have* been subjected to tests, the results of which *might have* exonerated the defendant" (*Youngblood*, at p. 57, italics added), the proscriptions of the federal Constitution are narrower; "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law" (*id.* at p. 58; accord, *People v. Tafoya* (2007) 42 Cal.4th 147, 187; *People v. DePriest* (2007) 42 Cal.4th 1, 42).

The loss of the hatchback car falls in the latter category. Duff did not demonstrate to the trial court, and does not establish here, that the car had any exculpatory value apparent to the police such that an obligation to preserve evidence would arise. Rather, he contends only that if it had been preserved, the

car could have been subjected to additional tests beyond those conducted by the People's expert, tests whose results might have supported Duff's theory that he was shot at and acted in self-defense.

Duff's claim of error fails because he cannot demonstrate the bad faith required under these circumstances by *Arizona v. Youngblood*, *supra*, 488 U.S. at page 58. Duff argues that the prosecution's failure to notify defense counsel of the intention eventually to destroy the car demonstrates bad faith, but (1) there was no showing of such a failure, as the original prosecutor simply could not recall whether she ever advised Duff's then-defense counsel, who was deceased by the time of the *Trombetta* hearing and thus unable to testify; and (2) Duff does nothing to rebut the showing that the car was disposed of in accordance with the police department's usual procedures for cars subjected to the particular toxic fingerprinting procedure employed in this case. A showing that evidence was disposed of in accordance with standard procedures in the ordinary course of business suggests police acted in good faith. (*People v. Tafoya*, *supra*, 42 Cal.4th at p. 187.)[9] Accordingly, no due process violation occurred.

### 2. *Introduction of Duff's Statements*

Duff moved pretrial to suppress all statements he made to the police while in custody on February 26, 1998, based on alleged violations of *Miranda v. Arizona* (1966) 384 U.S. 436 and due process. The trial court held an evidentiary

---

[9] For the first time in his reply brief, Duff argues that the failure to conduct further tests on the car in the six months or more it sat in a junk lot was ineffective assistance of counsel. It is rarely appropriate to resolve an ineffective assistance claim on direct appeal (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267); we certainly will not do so where, as here, the claim is omitted from the opening brief and thus waived (*People v. Barragan* (2004) 32 Cal.4th 236, 254, fn. 5; *Varjabedian v. City of Madera* (1979) 20 Cal.3d 285, 295, fn. 11).

hearing and denied the motion, concluding that Duff was advised of his rights and knowingly and voluntarily waived them, police were not required to readvise him when questioning resumed after a short break that same day, and nothing he said was the product of unlawful coercion or threats. After Duff's change in counsel resulted in a postponement of trial, a new trial judge afforded Duff the opportunity to reargue the motion, but the court again denied it. The prosecution thereafter played for the jury a videotape of a portion of Duff's interrogation, during which Duff confessed to shooting Riley and Hagan. Duff argues reliance on this evidence violated his privilege against self-incrimination and due process rights. (U.S. Const., 5th & 14th Amends.; Cal. Const., art. I, §§ 7, 15.)

"*Miranda v. Arizona*, *supra*, 384 U.S. 436, and its progeny protect the privilege against self-incrimination by precluding suspects from being subjected to custodial interrogation unless and until they have knowingly and voluntarily waived their rights to remain silent, to have an attorney present, and, if indigent, to have counsel appointed. [Citations.] 'If a suspect indicates "in any manner and at any stage of the process," prior to or during questioning, that he or she wishes to consult with an attorney, the defendant may not be interrogated.' [Citation.]" (*People v. Gamache* (2010) 48 Cal.4th 347, 384.) "To establish a valid *Miranda* waiver, the prosecution bears the burden of establishing by a preponderance of the evidence that the waiver was knowing, intelligent, and voluntary under the totality of the circumstances of the interrogation." (*People v. Linton* (2013) 56 Cal.4th 1146, 1171, citing *People v. Williams* (2010) 49 Cal.4th 405, 425.)

As well, "[b]oth the state and federal Constitutions bar the prosecution from introducing a defendant's involuntary confession into evidence at trial." (*People v. Linton*, *supra*, 56 Cal.4th at p. 1176; see also *People v. Scott* (2011) 52 Cal.4th 452, 480; *People v. Williams*, *supra*, 49 Cal.4th at p. 436.) As with *Miranda* waivers, the People bear the burden of establishing by a preponderance of the

evidence the voluntariness of a confession.  (*People v. Tully* (2012) 54 Cal.4th 952, 993; *Scott*, at p. 480; *People v. Carrington* (2009) 47 Cal.4th 145, 169.)

In reviewing the trial court's denial of a suppression motion on *Miranda* and involuntariness grounds, " ' "we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence.  We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained." ' " (*People v. Enraca* (2012) 53 Cal.4th 735, 753; accord, *People v. Williams*, *supra*, 49 Cal.4th at pp. 425, 436.)  Where, as was the case here, an interview is recorded, the facts surrounding the admission or confession are undisputed and we may apply independent review.  (*People v. McWhorter* (2009) 47 Cal.4th 318, 346.)

As we shall explain, the trial court did not err in admitting any of Duff's statements.

a.  Initial Waiver of *Miranda* Rights

On February 24, 1998, Duff was arrested on unrelated charges.  The next day, police discovered the car with Riley's and Hagan's bodies inside not far from where Duff lived and where he had been picked up.  On February 26, police questioned Duff about the Riley/Hagan murders.

At the outset of questioning, Detective Toni Winfield advised Duff of his *Miranda* rights to silence, to an attorney, and so on.  Duff replied that he understood them.  Asked whether he still wished to talk with Detective Winfield, Duff initially replied, "I don't know.  Sometimes they say it's—it's better if I have a—a lawyer."  The detective continued:

"WINFIELD:  You know, sometimes they do.  Yeah.  Yeah.  You know, but sometimes—uh—a lot of times people want to talk and—and want to—uh—

25

clarify, let's say for instance—um—where they were during that period of time. Because, really, you could provide me—and it's entirely up to you. It's—it really is. You can provide me with individuals who could verify where you were that I wouldn't otherwise get. You know what I mean? And so that's—um—that's kind of—uh—you know, the way it—the—the way it works. And in—in most cases, the individuals that I talk to do, in fact, give me—um—other circumstances for me to go and check out. That's why one person's interview leads to another person's, and another's, and another's, and we end up, you know, doing a lot of interviews. So that's why I told you I've all—I've—I have already spoken with quite a few people. And that's what, eventually, you know, led us to trying to talk to you.

"DUFF: Yeah.

"WINFIELD: And if at any time—like I say, if at any time you want to stop the interview and say, 'Hey, I don't—I don't—I don't feel like answering that question,' then you have that option.

"DUFF: Okay. Okay. I understand.

"WINFIELD: You understand?

"DUFF: Yeah.

"WINFIELD: Okay. So are you willing to talk about the—you know, where you were and that kind of a thing?

"DUFF: Yeah. (Unintelligible.)

"WINFIELD: Okay. I mean, I just want you to feel confident with that. You do feel—you feel confident with that?

"DUFF: Yeah.

"WINFIELD: Okay. All right. So—um—then you keep your rights in mind. And if at some time, you know, you don't feel like answering another question, then you—you just tell me no. Okay?

"DUFF: Okay."

Duff does not contend his remark, "Sometimes they say it's—it's better if I have a—a lawyer," was an unambiguous invocation of the right to counsel sufficient to require that all questioning cease. (See, e.g., *Smith v. Illinois* (1984) 469 U.S. 91, 98; *People v. Cruz* (2008) 44 Cal.4th 636, 668.) He does, however, argue that it was at least an equivocal invocation of the right to counsel, that it placed Detective Winfield under a duty to clarify Duff's desires and obtain a clear and unequivocal waiver, and that she never did so.

We agree with Duff that because his reference to a lawyer occurred at the beginning of questioning, the rules respecting pre-*Miranda* waiver invocations of the right to counsel apply. (See *People v. Williams, supra,* 49 Cal.4th at p. 427 [inquiries into the initial waiver of the right to counsel and the sufficiency of subsequent postwaiver invocation are distinct]; *United States v. Rodriguez* (9th Cir. 2008) 518 F.3d 1072, 1078-1080 [articulating different rules for police conduct before and after an initial waiver of the right to counsel].) Thus, the postwaiver rule rejecting any duty to clarify ambiguous invocations and permitting an officer to continue substantive questioning " 'until and unless the suspect *clearly* requests an attorney,' "[10] upon which the People principally rely, is inapposite here.

In the face of an initial equivocal reference to counsel, we have held that an officer is permitted to clarify the suspect's intentions and desire to waive his or her *Miranda* rights. (*People v. Williams*, *supra*, 49 Cal.4th at p. 428 [collecting

---

[10]  *People v. Williams*, *supra*, 49 Cal.4th at page 427, quoting *Davis v. United States* (1994) 512 U.S. 452, 461; see also *Berghuis v. Thompkins* (2010) 560 U.S. 370, 381 (If after waiver "an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation, [citation], or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights.").

cases].)  The Ninth Circuit has explicitly declared that an officer not only may, but *must*, clarify the suspect's intentions before initiating substantive questioning.  (*United States v. Rodriguez*, *supra*, 518 F.3d at p. 1080 ["Prior to obtaining an unambiguous and unequivocal waiver, a duty rests with the interrogating officer to clarify any ambiguity before beginning general interrogation."]; but cf. *Berghuis v. Thompkins*, *supra*, 560 U.S. at p. 387 [rejecting the argument that a clear waiver must always precede questioning because "[t]he *Miranda* rule and its requirements are met if a suspect receives adequate *Miranda* warnings, understands them, and has an opportunity to invoke the rights before giving any answers or admissions."].)  We have occasionally implied the same rule as the Ninth Circuit's.  (See, e.g., *People v. Box* (2000) 23 Cal.4th 1153, 1194 ["If a suspect's request for counsel or invocation of the right to remain silent is ambiguous, the police may 'continue talking with him *for the limited purpose* of clarifying whether he is waiving or invoking those rights.' "  Quoting *People v. Johnson* (1993) 6 Cal.4th 1, 27, italics added].)

Even so, no *Miranda* violation occurred here.  If we assume Duff's remark was an equivocal invocation of the right to counsel and that Detective Winfield was obligated to clarify Duff's desire to waive his rights before proceeding with the interrogation, she did so.  Before asking any other questions, Detective Winfield reiterated that the decision whether to talk was "entirely up to [Duff]" and he could "at any time . . . stop the interview."  She then asked directly, "So are you willing to talk about the—you know, where you were and that kind of a thing?"; he replied, "Yeah."  She asked again, "I just want you to feel confident with that.  You do feel—you feel confident with that?"; he repeated, "Yeah."  She confirmed a third time, "[Y]ou keep your rights in mind.  And if at some time, you know, you don't feel like answering another question, then you—you just tell me no.  Okay?"; he assented a third time to speak with her.  We agree with the trial

28

court that Detective Winfield was not under a legal obligation to follow any particular script in ascertaining Duff's desires; she did not badger Duff but instead lawfully "proceeded to talk to him to see whether or not he wanted to talk without having to ask him specifically to clarify his ambiguous statement any more than he did by continuing to talk." (See *People v. Clark* (1993) 5 Cal.4th 950, 991 [no *Miranda* violation where the "interrogators did not ask defendant substantive questions until defendant's position was clarified and a valid waiver was obtained" and "no coercive tactics were employed in order to obtain defendant's *Miranda* waiver."].)

b. Duty to Readvise of *Miranda* Rights

After less than an hour of questioning, Duff asked to stop, explaining that his head was "kind of numb" and he was "kind of brain boggled." Detective Winfield ended her questioning and prepared to leave. As she did, Duff asked if Detective Dick Woods was still around. Detective Winfield indicated Woods was and asked if Duff wanted to talk with him. Duff affirmed that he did.

Winfield left, and after 23 minutes, Detective Woods appeared. Woods and Duff engaged in small talk for a few minutes. After Duff asked for and was allowed a bathroom break, Woods indicated he wanted to ask Duff a few questions and offered to bring Detective Winfield back. Duff declined, explaining, "Well, it don't really matter, just—I just want to hurry up and get this over with, man." Detective Woods proceeded to question Duff; eventually, Duff confessed to shooting both Riley and Hagan.

Duff contends everything he said to Detective Woods should have been suppressed because he asked to stop the interview and because he did not receive new *Miranda* warnings after the break between questioning by Detective Winfield and Detective Woods.

The trial court correctly found no error. The record supports its conclusion that Detective Winfield promptly stopped questioning Duff when he asked for the interview to stop. It also supports the trial court's conclusion that Detective Woods only arrived to talk with Duff at Duff's request. Under these circumstances, no readvisement was required. "After a valid *Miranda* waiver, readvisement prior to continued custodial interrogation is unnecessary 'so long as a proper warning has been given, and "the subsequent interrogation is 'reasonably contemporaneous' with the prior knowing and intelligent waiver." [Citations.]' [Citation.] The necessity for readvisement depends upon various circumstances, including the amount of time that has elapsed since the first waiver, changes in the identity of the interrogating officer and the location of the interrogation, any reminder of the prior advisement, the defendant's experience with the criminal justice system, and '[other] indicia that the defendant subjectively underst[ood] and waive[d] his rights.' " (*People v. Williams*, *supra*, 49 Cal.4th at p. 434.) We have permitted as "reasonably contemporaneous" the resumption of interrogation without a readvisement even a day or two after the initial waiver. (E.g., *Williams*, at p. 435; *People v. Mickle* (1991) 54 Cal.3d 140, 171.) Questioning here just minutes later, in the very same location as before, by a detective specifically summoned by the defendant, a defendant the trial court found had been in prison four times before and was quite familiar with the criminal justice system, was entirely constitutional notwithstanding the absence of renewed *Miranda* warnings.

        c. Involuntariness

Finally, Duff argues his confession should have been suppressed because it was involuntary. " 'A statement is involuntary if it is not the product of " 'a rational intellect and free will.' " [Citation.] The test for determining whether a confession is voluntary is whether the defendant's "will was overborne at the time

30

he confessed." ' " (*People v. McWhorter*, *supra*, 47 Cal.4th at pp. 346-347.) In assessing whether statements were the product of free will or coercion, we consider the totality of the circumstances, including " ' "the crucial element of police coercion," ' " the length, location, and continuity of the interrogation, and the defendant's maturity, education, and physical and mental health. (*People v. Williams*, *supra*, 49 Cal.4th at p. 436.)

Duff emphasizes his low intelligence, his past drug use, and pain he was suffering from a scuffle with police when he tried to flee the night of his arrest. As evidence of police coercion, Duff asserts Detective Woods threatened to cause problems for Duff's friends and family. Duff offers no record cites, and with good reason; the transcript and videotape of his interview do not support the assertion. To the contrary, as the trial court found, no threats were made. Our own review of the transcript and videotape of Duff's interrogation reveals Detectives Winfield and Woods were trying *not* to get others in trouble and repeatedly steered clear of questions that might incriminate anyone other than Duff. We thus affirm the trial court's finding that neither Detective Winfield nor Detective Woods ever threatened or sought to coerce Duff. From the record, it appears Duff confessed to shooting Riley and Hagan not because his will was overborne, but because he was capable of making, and made, the rational choice to offer his side of events, in which he shot Riley and Hagan in self-defense, rather than out of a premeditated desire to obtain revenge for past slights. Accordingly, Duff's confession was not involuntary and was properly admitted.

### 3. *Admission of Victim Images*

At trial, the People sought to introduce several videotapes and photographs of the victims. The videotapes were taken of the area where the car containing the victims' bodies was discovered and showed, inter alia, Riley's and Hagan's bodies

31

in the state in which they were found. One set of still photographs likewise showed the interior of the car and the bodies in situ; another consisted of autopsy photos showing the location of the victims' bullet wounds. Duff objected to the jury being permitted to see close-ups of the victims' wounds as unduly prejudicial, but the trial court overruled the objection and concluded the evidence as a whole was far more probative than prejudicial. The autopsy photographs were introduced in conjunction with the expert testimony of Dr. Gregory Reiber, a forensic pathologist; the videotapes were played in conjunction with the testimony of Detective Jeffrey Gardner, the investigating officer who recorded them.

Duff renews his objection here, asserting that the introduction of images of the victims' wounds was an abuse of discretion and violated his constitutional rights to a fair trial and due process. (U.S. Const., 14th Amend.; Evid. Code, § 352.)[11] " 'The admission of allegedly gruesome photographs is basically a question of relevance over which the trial court has broad discretion.' [Citations.] The further decision whether to nevertheless exclude relevant photographs as unduly prejudicial is similarly committed to the trial court's discretion: 'A trial court's decision to admit photographs under Evidence Code section 352 will be upheld on appeal unless the prejudicial effect of such photographs clearly outweighs their probative value.' " (*People v. Bonilla*, *supra*, 41 Cal.4th at p. 353; see also *People v. McKinzie*, *supra*, 54 Cal.4th at p. 1351; *People v. D'Arcy* (2010) 48 Cal.4th 257, 298; *People v. Scheid* (1997) 16 Cal.4th 1, 13-19.)

The videotape and photographs were plainly relevant; indeed, Duff does not offer any argument against their relevance. The critical issue in the case was whether Duff acted in self-defense, firing at two men who were turned and facing

---

**11** Duff's constitutional argument was preserved by his trial objection on state statutory grounds. (*People v. Partida* (2005) 37 Cal.4th 428, 435-437.)

him with guns drawn, or whether he acted without provocation, shooting the victims while they may have been facing away. Officer testimony about the position of the victims' bodies and forensic testimony about the location of bullet wounds could help the jury reach a decision, but images of the victims necessarily provided crucial corroboration as to their positions and injuries and would have made it much easier to visualize which version of events fit. In these circumstances, a picture could be worth a thousand words; the images were not simply cumulative of other testimony. (See *People v. McKinzie*, *supra*, 54 Cal.4th at pp. 1351-1352 [autopsy and crime scene photos of a victim can be "highly probative of how the victim was killed"]; *People v. Brents* (2012) 53 Cal.4th 599, 617 [the People are not obligated to rely solely on live witnesses to the exclusion of photographic evidence]; *People v. Cruz*, *supra*, 44 Cal.4th at p. 671 [autopsy photos are admissible to corroborate coroner testimony].)

Nor were the images more prejudicial than probative. While they carried substantial probative value—showing, for example, that both Riley and Hagan were shot from behind—they depicted minimal blood and were no more gruesome than one would expect of any pictures of gunshot victims. (See *People v. Moon* (2005) 37 Cal.4th 1, 35 [" ' " '[M]urder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant.' " ' "].) The trial court's exercise of discretion to admit images of the victims was neither statutory nor constitutional error.

### 4. *Exclusion of Photo of Victim's Tattoo*

Before trial, the People moved to exclude reference to and photographs of Roscoe Riley's tattoos, in particular a tattoo on his right arm of a hand pointing a revolver. The trial court granted the motion. Duff contends exclusion of a photograph of Riley's gun tattoo violated his statutory and constitutional rights to

admission of relevant evidence. (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7; Evid. Code, § 351.) The trial court did not err.

Evidence must be relevant to be admissible. (Evid. Code, § 350.) Moreover, even if relevant, it may be excluded if the court determines that its prejudicial impact substantially outweighs any probative value. (*Id.* § 352.) We afford trial courts wide discretion in assessing whether in a given case a particular piece of evidence is relevant and whether it is more prejudicial than probative. (See *People v. Homick* (2012) 55 Cal.4th 816, 865; *People v. Tully*, *supra*, 54 Cal.4th at p. 1010.)

Duff argues the photograph was relevant to show both that Riley was armed (because it indicated an affinity for guns) and that Duff believed Riley to be armed and dangerous and thus had acted in self-defense. As to the tattoo tending to prove Riley carried a real gun on the day he was shot, the trial court correctly recognized it would be cumulative of considerable other testimony showing Riley was armed with a .357—a point, moreover, that the People freely conceded. As to the tattoo bearing on Duff's justifications for his actions, any such relevance would depend entirely on proving as a foundational matter that Duff knew Riley had such a tattoo, a point Duff acknowledges. The trial court invited Duff to introduce evidence that he knew of the tattoo. Duff did not. In the absence of such a foundation, it was not error to conclude the photograph of the tattoo was cumulative or simply irrelevant.[12]

---

[12] The trial court did not specify whether it was provisionally excluding the photograph on grounds of irrelevance or prejudice. To the extent its ruling rested in part on a conclusion the photograph's prejudicial impact outweighed any slender relevance it might have, because of negative associations jurors might have concerning people with tattoos, that conclusion would not have been an abuse of discretion.

Nor was exclusion of the photograph a violation of Duff's equal protection rights simply because the trial court simultaneously admitted numerous photographs of the decedents' gunshot wounds. Gunshot wound photographs, in combination with expert forensic testimony, supported the People's theory as to how Duff shot Riley and Hagan. The photograph of Riley's tattoo had no comparable relevance.

### 5. *Dismissal of Two Jurors for Illness*

At two different junctures during trial, jurors called in sick. Each time, the trial court consulted with counsel and, over defense objection, elected to replace the juror with an alternate. Duff contends these changes in the composition of the jury were an abuse of discretion and violated both his statutory rights and his federal and state constitutional rights to trial by an impartial jury. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16; § 1089.) We disagree.

On October 30, 2001, during presentation of guilt phase evidence, Juror No. 6 called in sick with the stomach flu and indicated she would likely be out for at least the next two days. Duff argued for a two-day continuance but volunteered that if the juror was then still sick, she would likely have to be replaced. The People opposed any continuance because the cross-examination of Cynthia Fernando, their most important witness, was scheduled to begin. Though Fernando was present and ready to testify, she had proved difficult to get to court; she had already failed to appear on two other occasions in the immediately preceding few days. If Fernando failed to show again after a continuance, the People feared either a motion to strike the direct testimony Fernando had already

given[13] or, in light of the significance of Fernando's testimony and the absence of any opportunity for cross-examination, a motion for mistrial. The trial court shared these concerns and replaced Juror No. 6.

On November 28, the first day of the penalty phase, Juror No. 3 called in sick. On November 24, while court was out of session over Thanksgiving, the juror was taken ill and went to the emergency room because of bouts of vomiting. By the fifth day of her illness, she was still sufficiently unwell to appear. Defense counsel expressed reservations about substituting an alternate who had not participated in guilt phase deliberations and asked the court to continue the matter for one day before replacing the juror. Relying on its evaluation of the juror's voice on the voice mail she left, the juror's subsequent conversation with the court clerk, and concerns the juror had expressed about her health during voir dire,[14] the trial court removed her and substituted an alternate. To address Duff's concerns about the alternate's absence from guilt phase deliberations, the court offered to give, and ultimately gave, a pinpoint instruction approved by the defense.

Trial courts may remove any juror who "becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty . . . ." (§ 1089.) A trial court learning of grounds for dismissal "has an affirmative obligation to investigate." (*People v. Bonilla*, *supra*, 41 Cal.4th at p. 350.) However, "[b]oth the scope of any investigation and the ultimate decision whether to discharge a given juror are committed to the sound discretion of the trial court."

---

[13]    That testimony included Duff's statements to Fernando that he was angry with Riley, that he planned to set him up, rob him, and kill him, and that he had in fact killed Riley and his friend, as well as her testimony that in the immediate aftermath of the shootings Duff never mentioned self-defense. (See *ante*, pp. 3-4.)

[14]    Before trial, the juror asked to be excused for cause on health grounds, but the trial court at that point declined to excuse her.

(*Ibid.*; see also *People v. Nunez and Satele* (2013) 57 Cal.4th 1, 57; *People v. Thompson*, *supra*, 49 Cal.4th at p. 137.)

Duff emphasizes that in reviewing a decision to excuse a juror, we do not ask only whether substantial evidence supports the decision—i.e., whether there is evidence from which a reasonable trial court could have concluded dismissal was warranted—but further whether it appears as a "demonstrable reality" that the trial court actually did rely on such evidence as the basis for its decision. (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052-1053.) He contends reversal under this standard is required because the trial court dismissed the jurors as a matter of administrative convenience without obtaining proof to a demonstrable reality that each juror would be unable to continue.

This argument mistakes the effect of the "less deferential review" (*People v. Barnwell*, *supra*, 41 Cal.4th at p. 1052) we apply to decisions to remove jurors. The requirement we add to traditional substantial evidence review is that the record establish the actual basis for the trial court's decision. So long as it does, we ask only whether the evidence relied upon was sufficient to support that basis as grounds for dismissal; we do not independently reweigh the evidence or demand more compelling proof than that which could satisfy a reasonable jurist. (*Id.* at pp. 1052-1053.)

Here, it is undisputed each excused juror was ill and that the illnesses occasioned their dismissals. By statute, illness is cause to dismiss a juror. (§ 1089; *People v. Roberts* (1992) 2 Cal.4th 271, 324.) The demonstrable reality test does not demand of trial judges confronted with sick jurors that they elicit conclusive proof of the length of future incapacitation; judges are lawyers, not

doctors.[15] Nor does it demand that incapacitation exceed some preset length; in the right circumstances, an absence of a day or less may warrant excusal. (*People v. Bell* (1998) 61 Cal.App.4th 282, 286-289; *People v. Hall* (1979) 95 Cal.App.3d 299, 305-307.) Whether a juror's illness can best be accommodated by a continuance or replacement with an alternate is a matter committed to the trial court's discretion.

With respect to Juror No. 6, the trial court shared the People's concern about witness Fernando's unreliability and the consequent risks a continuance would pose; additionally, it was concerned that a two-day continuance would result in a lengthy gap between presentation of evidence and closing arguments on one or both sides, a gap that might impair either party's presentations or impact juror deliberations. With respect to Juror No. 3, the trial court was presented with a juror who had already been ill for five days and was not guaranteed to be well on the sixth day. Neither decision to substitute an alternate was an abuse of discretion.

### 6. Refusal to Instruct on Lesser Included Offenses

At the close of the guilt phase, Duff sought instructions on second degree murder and voluntary manslaughter under theories of imperfect self-defense and heat of passion. The trial court denied the request and confined its instructions to

---

[15] While Duff takes issue with the extent of the trial court's investigation, the Legislature has left the procedure for determining whether grounds for dismissal exist in the trial court's hands. (*People v. Bonilla*, *supra*, 41 Cal.4th at p. 350; *People v. Dell* (1991) 232 Cal.App.3d 248, 256.) In cases of illness, a court is not obligated to call a juror into court to substantiate his or her excuse and can rely on phone calls instead. (*Dell*, at p. 256.) Moreover, in neither instance here does Duff dispute the facts surrounding the jurors' unavailability; instead, he takes issue with the trial court's chosen remedy. It is unclear what, if any, impact further investigation would have had on that choice.

first degree murder and justifiable homicide in perfect self-defense. In this court, Duff argues the refusal to instruct on voluntary manslaughter as a lesser included offense of first degree murder violated his federal constitutional rights by foisting on the jury an all-or-nothing choice between capital murder and acquittal. (U.S. Const., 8th & 14th Amends.; see *Beck v. Alabama* (1980) 447 U.S. 625, 627.)

A trial court must instruct on all lesser included offenses supported by substantial evidence. (*People v. Booker*, *supra*, 51 Cal.4th at p. 181; *People v. Breverman* (1998) 19 Cal.4th 142, 154-155.) The duty applies whenever there is evidence in the record from which a reasonable jury could conclude the defendant is guilty of the lesser, but not the greater, offense. (*People v. Verdugo* (2010) 50 Cal.4th 263, 293; *People v. Avila* (2009) 46 Cal.4th 680, 705.) That voluntary manslaughter is a lesser included offense of murder is undisputed. (*Booker*, at p. 181; *Verdugo*, at p. 293; *Avila*, at p. 705, *Breverman*, at p. 154.)

Imperfect self-defense, which reduces murder to voluntary manslaughter, arises when a defendant acts in the actual but unreasonable belief that he is in imminent danger of death or great bodily injury. (*People v. Booker*, *supra*, 51 Cal.4th at p. 182; *People v. Manriquez* (2005) 37 Cal.4th 547, 581; *In re Christian S.* (1994) 7 Cal.4th 768, 771.) Heat of passion, which likewise reduces murder to voluntary manslaughter, arises when the defendant is provoked by acts that would "render an ordinary person of average disposition 'liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment' " (*People v. Beltran* (2013) 56 Cal.4th 935, 957) and kills while under the actual influence of such a passion (*People v. Enraca*, *supra*, 53 Cal.4th at p. 759). Duff is correct that if substantial evidence supported either theory, the trial court was obligated to agree to instruct on voluntary manslaughter.

The difficulty for Duff is that, as the People argued below and reiterate here, there simply was no such evidence. Duff points to the confession that was

played for the jury, in which he described Riley and Hagan pulling multiple guns on him and then opening fire, and argues the jury could have credited that version of events. Indeed it could have. But the problem, at least for finding an obligation to instruct on voluntary manslaughter, is that if believed, Duff's version could lead only to a finding of justifiable homicide and a total acquittal on the homicide charges. The use of lethal force in response to being shot at repeatedly is perfect self-defense and no crime. (§ 197; *People v. Randle* (2005) 35 Cal.4th 987, 991.) While Duff argues the jury could have concluded he unreasonably misperceived the situation, the circumstances described by Duff leave no room for such shades of gray. Either he was attacked, in which case he committed no crime, or he was not, in which case he committed murder.

Accordingly, it was not state law error to refuse an instruction on voluntary manslaughter. Nor was it federal constitutional error. As Duff concedes, the constitutional requirement that capital juries be instructed on lesser included offenses extends only to those lesser included offenses supported by substantial evidence. (See *Schad v. Arizona* (1991) 501 U.S. 624, 648; *Beck v. Alabama*, *supra*, 447 U.S. at p. 627.) Here, none were.

### 7. *Cumulative Guilt Phase Error*

Duff contends that if we do not conclude that any individual guilt phase error mandates guilt phase reversal, the cumulative effect of the guilt phase errors nevertheless rendered his trial unreliable. We disagree. We have identified no errors. In the absence of error, there is nothing to cumulate.

### C. PENALTY PHASE ISSUES

#### 1. *Use of Prior Crimes*

The People's penalty phase case consisted principally of evidence of Duff's extensive history of prior violent criminal acts. (§ 190.3, factor (b).) Duff

objected on Evidence Code section 352 and unspecified state and federal constitutional grounds but conceded that settled law permitted the People to prove these acts. The trial court deemed Duff's objection a continuing one and over his objection permitted extensive evidence of past bad acts.

On appeal, relying on a panoply of out-of-state decisions, Duff asks that we reconsider whether the Legislature's decision to permit penalty phase consideration of unrelated, and occasionally unadjudicated, violent acts renders death penalty decisions unreliable in violation of the Eighth and Fourteenth Amendments of the federal Constitution. We have repeatedly reaffirmed the constitutionality of section 190.3, factor (b), and Duff offers no persuasive reason to overrule these decisions. (See, e.g., *People v. Tully*, *supra*, 54 Cal.4th at p. 1029; *People v. Thomas*, *supra*, 51 Cal.4th at p. 504; *People v. Booker*, *supra*, 51 Cal.4th at pp. 187-188; *People v. Taylor* (2010) 48 Cal.4th 574, 651-652.)

In the alternative, Duff argues that even if section 190.3, factor (b) is not per se unconstitutional, to permit the jury to consider together a series of unrelated incidents from a 20-year time period that in some instances resulted in neither charges nor convictions was unconstitutional. The objection that the incidents involved neither charges nor convictions is a rephrasing of the objection to the Legislature's decision to permit consideration of unadjudicated conduct under factor (b) and fails in light of our long-standing reaffirmation of the constitutionality of that factor. As for the objection that the incidents were unrelated and covered a long time frame, "[t]he purpose of section 190.3, factor (b) 'is to enable the jury to make an individualized assessment of the character and history of a defendant to determine the nature of the punishment to be imposed.' " (*People v. Tully*, *supra*, 54 Cal.4th at p. 1029.) If permitting the jury to consider the presence or absence of a prior pattern of violent misfeasance is constitutional, it surely is no less constitutional to allow the jury to consider that factor where, as

41

here, a defendant has compiled a two-decade history of widespread and varied misconduct. While some acts the People relied on were far removed in time from the double homicide, "[r]emoteness of the prior criminal conduct affects the weight of the evidence, not its admissibility." (*People v. Tafoya*, *supra*, 42 Cal.4th at p. 186.)

Finally, Duff argues that admission of his extensive prior misconduct was enormously prejudicial and thus unfairly skewed the jury's deliberations. But " '[p]rejudice' in the context of Evidence Code section 352 is not synonymous with 'damaging': it refers to evidence that poses an intolerable risk to the fairness of the proceedings or reliability of the outcome. [Citation.] Although the evidence of his violent criminal activity likely was damaging to defendant, he fails to demonstrate how it was *unduly prejudicial*—the inference that he was dangerous was entirely proper. Accordingly, the trial court did not abuse its discretion in admitting this evidence, and defendant's constitutional rights were not violated." (*People v. Booker*, *supra*, 51 Cal.4th at p. 188.)

### 2. *Exclusion of Rebuttal Victim Impact Evidence*

Before the start of the penalty phase, Duff moved to be permitted to introduce rebuttal evidence of the decedents' character in the event the People presented positive victim impact evidence. The trial court agreed that to the extent testimony opened the door to rebuttal, Duff should be permitted to introduce evidence to controvert the picture the prosecution presented of Hagan and Riley and the impact their deaths had on others. For example, testimony that Riley's children were saddened by his death would, in the court's eyes, open the door to testimony that the children had witnessed and/or been the victims of domestic violence at Riley's hand.

In light of the court's comments, and to avoid extensive rebuttal, the People confined their victim impact evidence to testimony that (1) Riley was survived by grandparents, a mother, a sister, and two children; (2) it had been difficult for his children's mother, Marie Correa, to tell them of his death; (3) Hagan was likewise survived by family; and (4) Hagan's best friend had fainted when she learned of his death and had kept some of his ashes and devoted a shelf in her bedroom to mementos of him. The People also introduced without comment a photo of Correa with her and Riley's two daughters. Given an offer of proof as to this abbreviated presentation, the trial court precluded Duff from presenting evidence of Riley's and Hagan's criminal backgrounds and child support delinquency histories, Riley's domestic violence toward Correa, and a Correa statement reflecting her relief that Riley was dead. Duff contends this exclusion violated his right to rebut favorable victim impact testimony.

In the course of concluding that victim impact evidence is constitutionally admissible at the penalty phase of a capital trial, the United States Supreme Court has recognized that a defendant necessarily may have the opportunity to cross-examine prosecution witnesses and submit contrary relevant evidence. (*Payne v. Tennessee* (1991) 501 U.S. 808, 823; see also *Booth v. Maryland* (1987) 482 U.S. 496, 506-507, overruled on other grounds by *Payne*, at p. 830; *Booth*, at p. 518 (dis. opn. of White, J.).) The right to present rebuttal, or "negative," victim impact evidence to counter evidence offered by the People in their penalty case-in-chief is subject to the usual evidentiary constraints that proffered evidence must be relevant and more probative than prejudicial. (Evid. Code, §§ 350, 352; *People v. Rogers* (2013) 57 Cal.4th 296, 346; *People v. Harris* (2005) 37 Cal.4th 310, 352-353; see *Harris,* at pp. 374-375 (conc. & dis. opn. of Kennard, J.) [agreeing that proffered evidence must be relevant while disagreeing with the majority over whether the specific excluded evidence actually was].) We review the trial court's

decision to limit or exclude rebuttal victim impact evidence on these grounds for abuse of discretion. (*Rogers*, at p. 347; see also *People v. Ramos* (2004) 34 Cal.4th 494, 528.)

The admissibility of evidence as rebuttal depends on the nature of the case-in-chief evidence a defendant seeks to rebut. In *People v. Boyette* (2002) 29 Cal.4th 381, 444-445, for example, we upheld exclusion of evidence of the murder victims' poor character the defendant sought to introduce as a rejoinder to testimony from survivors about their grief and love for the decedents. *Payne* endorses the introduction of two types of impact evidence: (1) " 'a quick glimpse of the life' which a defendant 'chose to extinguish' " and (2) a demonstration of "the loss to the victim's family and to society which has resulted from the defendant's homicide" (*Payne v. Tennessee*, *supra*, 501 U.S. at p. 822)—what may be thought of as decedent impact evidence and survivor impact evidence. The prosecution in *Boyette* limited itself to survivor impact evidence in a way that left no misleading portrayal of the victim to which the defendant's proffered negative impact evidence might offer relevant rebuttal; evidence of the victims' character could do nothing to rebut the genuineness of any loss felt by survivors. (*Boyette*, at p. 445.)

The same is true here. The prosecution called only two impact witnesses, Marie Correa, the mother of Riley's daughters, and Makala Tiller, a friend of Hagan's. In light of the trial court's rulings, the prosecutor omitted any originally intended questions that might have shed light on Riley's and Hagan's character, questions the trial court made clear would have permitted the defense to elicit testimony about their criminal conduct, Riley's domestic abuse of Correa, and the mixed emotions Correa felt at the death of her abuser. Given the very limited scope of the actual direct examination, it was not an abuse of discretion for the trial court to foreclose the defense from cross-examining Correa or Tiller about

44

domestic violence, child support, or criminal conduct.  There was no misleading favorable testimony of Riley's and Hagan's roles as family men to discredit, nor was there testimony about survivors' reactions that painted for the jury a misleadingly incomplete picture.  (See Evid. Code, §§ 761, 773, subd. (a) [scope of cross-examination limited by scope of direct examination]; *People v. Farley* (2009) 46 Cal.4th 1053, 1109 [cross-examination permitted to disabuse jury of misimpressions created by direct examination].)

Duff relies heavily on *People v. Rogers*, *supra*, 57 Cal.4th 296, in which the trial court, while excluding some evidence as cumulative or unduly prejudicial, permitted considerable defense evidence concerning the murder victim's character.  *Rogers* is inapposite; there, unlike here, the prosecution introduced extensive victim impact evidence relating not only to survivor impact but to the decedent's character, and the defendant was accordingly afforded an opportunity to respond.  (*Id.* at pp. 345-347.)

### 3.  *Prosecutorial Misconduct: Penalty Phase Closing Argument*

During penalty phase closing argument, the prosecution sought to defuse defense expert testimony that Duff had a diminished IQ by illustrating the sorts of books he read.  Defense mental health expert Dr. Albert Globus had testified on direct that Duff read novels and the Bible; on cross-examination, the prosecutor elicited the names of particular authors Duff read, including Stephen King, John Grisham, Dean Koontz, and L. Ron Hubbard.  During closing, the prosecutor displayed to the jury five novels and told the jury, "All these books, not necessarily these particular books, but are books that apparently the defendant likes to read.  Doctor Globus told us that although [Duff] has this incredibly low IQ, he actually enjoys reading novels.  He reads these.  [¶] He reads—some of his favorite authors are, I don't know, Grisham, Dean Koontz, and Stephen King, and

45

I think he mentioned L. Ron Hubbard also. Books he reads, books he can digest, books he has the mental capacity to understand. [¶] Probably some or all of you have read some of these authors, and what does that tell us[?] Really when you come down to it, what does it say about his IQ[?] So his IQ is 87, upper end of low normal. You make whatever you want out of his IQ."

During a break between the prosecutor's and defendant's closing argument, Duff's counsel was for the first time able to see what books the prosecutor had shown the jury: Dean Koontz's Mr. Murder (1993) and The Bad Place (1990), John Grisham's The Runaway Jury (1996) and The Client (1993), and Stephen King's The Tommyknockers (1987). Counsel moved for a mistrial, arguing that the titles prejudiced Duff and could impermissibly sway the jury. The prosecutor argued that he had cautioned these were not necessarily books Duff himself had read, and offered that the court could admonish the jury again that there should be no suggestion Duff had ever read the particular books the prosecutor showed them. The trial court took the matter under advisement, simultaneously asking defense counsel to mull over the prosecution's suggested admonishment.

After a break, the court denied the motion for mistrial. Off the record, defense counsel apparently elected to waive admonishment in lieu of an opportunity to directly respond during closing argument, and the court made note of the fact that at the defense's request the five novels remained on display in the courtroom. During closing, Duff's counsel addressed the issue and dismissed the display of books as a cheap gimmick: "Then he brings up some books here. And I have to comment on them because they were sitting here for about an hour. And first one—Dean Koontz, The Bad Place—a good choice for the type of environment here. The Bad Place. What we found out during the break here— during lunch—is—all of these books here didn't come from Mr. Duff obviously— they came from [the prosecutor's] personal library. So he's—these selections

46

have nothing to do with Mr. Duff. But they're interesting choices by [the prosecutor] to put them here. So we have The Bad Place. We have Mr. Murder by Dean Koontz. We have The Runaway Jury by John Grisham. And we have Stephen King The Tommyknockers anyway.[16] [¶] I will say this. What you hear the doctor say was when he talked to Mr. Duff he was reading the Bible. We don't have the Bible here. But—I guess that that should have been placed on there by [the prosecutor]. But he chose not to. But this is what you do—kind of bolster your case with little bitty gimmicks here—the books, the photos, which really don't have much to do with anything."

Following the death verdict, Duff moved for a new trial based, inter alia, on the display of the five novels to the jury. The trial court denied the motion, explaining that Duff had waived the issue by electing to respond rather than have the jury admonished and, in any event, "the remedy that was employed was far more effective than whatever curative instruction I would have given, and that was essentially to embarrass [the prosecutor] in front of the jury by having to admit that all of those books were his."

On appeal, Duff contends that the prosecutor's misconduct deprived him of a fair trial and a reliable penalty determination. (U.S. Const., 8th & 14th Amends.) The claim is forfeited. Although Duff timely objected, he thereafter elected to forego a curative instruction in favor of highlighting the prosecutor's argument and using it to argue that the case for death rested on a series of gimmicks. To preserve a claim of prosecutorial misconduct, a defendant must seek a jury admonition or show one would have been futile. (E.g., *People v.*

---

**16** The fifth novel, The Client, had only author John Grisham's name on the spine. Because the jury had not been exposed to the title, counsel at the court's direction did not disclose it.

47

*Blacksher*, *supra*, 52 Cal.4th at p. 829; *People v. Ledesma*, *supra*, 39 Cal.4th at p. 726.)  Notwithstanding Duff's " 'ritual incantation' [citation] that a jury admonition would have made no difference, [he] identifies nothing in the record to suggest this would have been so." (*People v. Gamache*, *supra*, 48 Cal.4th at p. 388.)

In any event, we find no prejudicial misconduct.  "A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact." (*People v. Avila*, *supra*, 46 Cal.4th at p. 711.)  A defendant asserting prosecutorial misconduct must further establish a reasonable likelihood the jury construed the remarks in an objectionable fashion.  (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 305.)

The prosecutor's choice of books to show the jury was ill-considered.  To make the point that Duff was not especially low-functioning by illustrating the sorts of "books that apparently the defendant likes to read," the prosecutor surely could have found novels with titles less inflammatory and potentially prejudicial than Mr. Murder.  But the prosecutor simultaneously cautioned that these particular books were not necessarily ones Duff had read, and defense counsel reiterated that the chosen novels were from the prosecutor's personal collection, not Duff's.  The prosecutor's remarks are neither reprehensible nor alone a due process violation and, considering everything that was said during closing argument, there is no reasonable likelihood the jury was deceived into believing Duff in fact read any of the proffered books.

### 4.  *Cumulative Prejudice from Errors*

Duff contends that even if we do not conclude any individual error mandates reversal, the cumulative effect of the penalty phase errors requires

reversal of the penalty verdict. We disagree. We have identified no errors; there is, accordingly, nothing to cumulate.

### 5. *Constitutionality of California's Death Penalty*

Finally, Duff raises a series of challenges to the constitutionality of California's death penalty. We have rejected each before. As Duff offers no compelling arguments in favor of reconsidering any of these rulings, we do so again.

California's special circumstances (see § 190.2) adequately narrow the class of murderers eligible for the death penalty. (*People v. Williams* (2013) 56 Cal.4th 165, 201; *People v. Homick*, *supra*, 55 Cal.4th at p. 903; *People v. Tully*, *supra*, 54 Cal.4th at p. 1067; *People v. Lightsey* (2012) 54 Cal.4th 668, 731; *People v. McDowell* (2012) 54 Cal.4th 395, 443; *People v. Streeter* (2012) 54 Cal.4th 205, 267.) While Duff contends the ballot arguments in favor of Proposition 7, "which became the current death penalty law, reflect an intent to expose every murderer to the death penalty, we have rejected that assertion as a misconstruction of the ballot arguments." (*People v. Bonilla*, *supra*, 41 Cal.4th at p. 358; *People v. Gray* (2005) 37 Cal.4th 168, 237, fn. 23.)

Section 190.3, factor (a), which permits the jury to consider the circumstances of the crime in deciding whether to impose the death penalty, does not license the arbitrary and capricious imposition of the death penalty. (*Tuilaepa v. California* (1994) 512 U.S. 967, 975-976; *People v. Williams*, *supra*, 56 Cal.4th at p. 201; *People v. Valdez* (2012) 55 Cal.4th 82, 179; *People v. Tully*, *supra*, 54 Cal.4th at p. 1067; *People v. Thomas* (2012) 54 Cal.4th 908, 949; *People v. Lightsey*, *supra*, 54 Cal.4th at p. 731; *People v. McDowell*, *supra*, 54 Cal.4th at p. 443.)

Nothing in the state or federal Constitution requires that the penalty jury (1) issue written findings, (2) unanimously agree on any particular aggravating circumstances, (3) find true beyond a reasonable doubt any particular aggravating circumstances, or (4) find that aggravating factors outweigh mitigating factors beyond a reasonable doubt. (E.g., *People v. Homick*, *supra*, 55 Cal.4th at pp. 902-903; *People v. Valdez*, *supra*, 55 Cal.4th at pp. 179-180; *People v. Gamache*, *supra*, 48 Cal.4th at pp. 406-407; *People v. Loker* (2008) 44 Cal.4th 691, 755.) Duff argues we should reconsider these conclusions in light of *Apprendi v. New Jersey* (2000) 530 U.S. 466, *Ring v. Arizona* (2002) 536 U.S. 584, *Blakely v. Washington* (2004) 542 U.S. 296, and *Cunningham v. California* (2007) 549 U.S. 270, cases which impose procedural constraints on fact finding in criminal trials, but we have repeatedly explained that this argument rests on a misconception of the nature of California's capital sentencing scheme. "[T]he ultimate determination of the appropriateness of the penalty and the subordinate determination of the balance of evidence of aggravation and mitigation do not entail the finding of facts that can increase the punishment for murder of the first degree beyond the maximum otherwise prescribed. Moreover, those determinations do not amount to the finding of facts, but rather constitute a single fundamentally normative assessment [citations] that is outside the scope of" *Apprendi* and its progeny. (*People v. Griffin* (2004) 33 Cal.4th 536, 595; accord, *People v. Lightsey*, *supra*, 54 Cal.4th at p. 731; *People v. McDowell*, *supra*, 54 Cal.4th at p. 443; *People v. Jones*, *supra*, 54 Cal.4th at p. 86; *People v. Taylor*, *supra*, 47 Cal.4th at p. 899; *Loker*, at p. 755.)

The inclusion of the adjectives "extreme" and "substantial" in the list of mitigating factors (§ 190.3, factors (d) & (g)) does not impermissibly constrict consideration of mitigating evidence and is consistent with the state and federal Constitutions. (*People v. Valdez*, *supra*, 55 Cal.4th at p. 180; *People v. Tully*,

*supra*, 54 Cal.4th at pp. 1068-1069; *People v. Thomas*, *supra*, 54 Cal.4th at p. 949; *People v. Lightsey*, *supra*, 54 Cal.4th at pp. 731-732; *People v. McDowell*, *supra*, 54 Cal.4th at p. 444; *People v. Hartsch* (2010) 49 Cal.4th 472, 516.)  Nor was the trial court constitutionally required to instruct the jury that section 190.3's mitigating factors could be considered only as mitigating factors and that the absence of evidence supporting any one of them should not be viewed as an aggravating factor.  (E.g., *Lightsey*, at p. 731; *People v. Jones*, *supra*, 54 Cal.4th at p. 87; *People v. Gamache*, *supra*, 48 Cal.4th at p. 406.)

Neither the state nor the federal Constitution requires intercase proportionality review, also known as comparative proportionality review.  (E.g., *People v. Homick*, *supra*, 55 Cal.4th at p. 903; *People v. Valdez*, *supra*, 55 Cal.4th at p. 180; *People v. Tully*, *supra*, 54 Cal.4th at p. 1068; *People v. Thomas*, *supra*, 54 Cal.4th at p. 950; *People v. Lightsey*, *supra*, 54 Cal.4th at p. 732; *People v. McDowell*, *supra*, 54 Cal.4th at p. 444.)

Consideration by the jury of unadjudicated criminal conduct at the penalty phase does not violate the state or federal Constitution.  (E.g., *People v. Tully*, *supra*, 54 Cal.4th at p. 1068; *People v. Thomas*, *supra*, 54 Cal.4th at p. 949; *People v. Streeter*, *supra*, 54 Cal.4th at p. 268; *People v. Loker*, *supra*, 44 Cal.4th at p. 756.)  Nor do *Apprendi v. New Jersey*, *supra*, 530 U.S. 466 and its progeny require the jury to unanimously agree beyond a reasonable doubt on any prior criminal conduct before considering it; as previously discussed, these decisions are inapplicable to California's capital sentencing scheme.  (*People v. Bonilla*, *supra*, 41 Cal.4th at p. 359; *People v. Griffin*, *supra*, 33 Cal.4th at p. 595; *People v. Snow* (2003) 30 Cal.4th 43, 126, fn. 32.)

The equal protection clause does not require California to include in its capital sentencing scheme every procedural protection provided noncapital defendants.  (*People v. Valdez*, *supra*, 55 Cal.4th at p. 180; *People v. Tully*, *supra*,

51

54 Cal.4th at p. 1069; *People v. Thomas*, *supra*, 54 Cal.4th at p. 949; *People v. Lightsey*, *supra*, 54 Cal.4th at p. 732; *People v. Loker*, *supra*, 44 Cal.4th at p. 756; *People v. Manriquez*, *supra*, 37 Cal.4th at p. 590.)

Duff's "argument that the use of capital punishment 'as *regular punishment* for substantial numbers of crimes' violates international norms of human decency and hence the Eighth Amendment to the United States Constitution fails, at the outset, because California does not employ capital punishment in such a manner. The death penalty is available only for the crime of first degree murder, and only when a special circumstance is found true; furthermore, administration of the penalty is governed by constitutional and statutory provisions different from those applying to 'regular punishment' for felonies. (E.g., Cal. Const., art. VI, § 11; §§ 190.1-190.9, 1239, subd. (b).)" (*People v. Demetrulias* (2006) 39 Cal.4th 1, 43-44; accord, *People v. Homick*, *supra*, 55 Cal.4th at p. 904; *People v. Tully*, *supra*, 54 Cal.4th at p. 1070; *People v. Thomas*, *supra*, 54 Cal.4th at p. 950; *People v. Lightsey*, *supra*, 54 Cal.4th at p. 732.)

Finally, Duff's sentence is not so disproportionate to his conduct, the double murders of a virtual stranger and a second man over a possible $100 debt, as to shock the conscience, offend fundamental notions of human dignity, and violate the Eighth and Fourteenth Amendments. (See *People v. Rountree*, *supra*, 56 Cal.4th at pp. 860-862; *People v. Loker*, *supra*, 44 Cal.4th at p. 756.)

We thus adhere to our conclusion that, whether considered individually or collectively, the aspects of California's death penalty Duff challenges do not render it unconstitutional.

## III. DISPOSITION

The trial court's judgment is affirmed in its entirety.

**WERDEGAR, J.**

**WE CONCUR:**

**BAXTER, J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**McCONNELL, J.**[*]

---

[*] Presiding Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Acting Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CONCURRING OPINION BY KENNARD, ACTING C. J.**


I concur in the majority opinion, except for its analysis concerning the exclusion of defendant's rebuttal victim impact evidence. (Maj. opn., *ante*, at pp. 42-45.) On that issue, I agree with the majority that the trial court did not err in excluding the evidence defendant offered to rebut the prosecution's victim impact evidence, a conclusion that is consistent with the views I expressed in my concurring and dissenting opinion in *People v. Harris* (2005) 37 Cal.4th 319, 372-376. Defendant here did not seek to introduce the evidence in question as evidence pertaining to the circumstances of the crime under Penal Code section 190.3's subdivision (a), and it was not relevant to rebut the prosecution's limited victim impact evidence. (*People v. Harris*, *supra*, 37 Cal.4th at pp. 372-376 [conc. & dis. opn. of Kennard, J.].)


                                        KENNARD, ACTING C. J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Duff
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S105097
**Date Filed:** January 30, 2014
_____

**Court:** Superior
**County:** Sacramento
**Judge:** Thomas M. Cecil

_____

**Counsel:**

Jonathan P. Milberg, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Harry Joseph Colombo and John A. Bachman, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Jonathan P. Milberg
225 South Lake Avenue, Suite 300
Pasadena, CA  91101
(626) 432-5427

John A. Bachman
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 322-5221