Filed 10/14/24  P. v. Navarro CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B323579 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA113232) |
| v. | |
| CARLO ADRIAN NAVARRO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Laura Laesecke, Judge.  Affirmed.

Tracy J. Dressner, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

On Halloween night in 2019, appellant and defendant Carlo Adrian Navarro, then 20 years old, was driving a large sport utility vehicle (SUV) down a residential street. He was heavily intoxicated and racing along at more than two times the speed limit. He careened past two stop signs without slowing down, failed to negotiate a bend in the road, and drove up onto the sidewalk at full speed. There, Navarro plowed into Joseph and Raihan Awaida and their three-year-old son Omar[1] who were walking home from trick or treating. Navarro's SUV was going so fast and hit the Awaida family with so much force that all three died shortly after Navarro drove straight into them.

The People charged Navarro with three counts of second degree murder (Pen. Code, § 187, subd. (a)) and three counts of vehicular manslaughter (*id.*, § 191.5, subd. (a)). A jury convicted him on all counts. The jury also found true allegations that, in committing vehicular manslaughter, Navarro caused bodily injury and death to more than one victim. (Veh. Code, § 23558.) The court sentenced Navarro to 25 years to life.[2]

---

[1] Because the three victims share the same surname, to avoid confusion we refer to them by their first names. No disrespect is intended.

[2] The components of this sentence are as follows: as to the murder convictions, the court sentenced Navarro to 15 years to life for the murder in count 3, 15 years to life on the murder in count 2, to be served concurrent with the sentence on count 3, and imposed but stayed his sentence for the murder in count 1; as to the manslaughter convictions, the court imposed the high term of 10 years for the vehicular manslaughter in count 4, and imposed but stayed the sentences for the two vehicular manslaughter convictions in counts 5 and 6. The court also

Navarro challenges the sufficiency of the evidence supporting the implied malice element of the murder convictions. He also challenges several evidentiary rulings, including the admission into evidence of autopsy photos during the testimony of medical examiners about the victims' injuries and causes of their death. We conclude the record discloses substantial evidence of implied malice and reject Navarro's challenge to the sufficiency of that evidence. We further conclude that the trial court did not abuse its discretion in overruling Navarro's objections to the autopsy photographs or in making other challenged evidentiary rulings. Accordingly, we affirm.

## NAVARRO'S OFFENSE CONDUCT

"We review the evidence in the light most favorable to the People and presume the existence of every fact the trier could reasonably deduce from the evidence that supports the judgment. [Citation.] The following summary is based on this appellate standard of review." (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1543.)

## A.    Navarro's Drinking Before the Collision

In video recorded interviews played for the jury, Navarro provided the details of his activities in the hours leading up to him running over Joseph, Raihan, and Omar. On October 31, 2019, after finishing work that evening, Navarro met with friends. At 8:30 p.m., Navarro drove them in his Toyota Sequoia SUV to a liquor store, where they got bottles of vodka and

---

struck the enhancement allegations under Vehicle Code section 23558. The court required Navarro to serve his sentences for manslaughter and murder concurrently, resulting in an effective sentence of 25 years to life.

whiskey.  Navarro then drove with his friends to an abandoned golf course, where they drank the whiskey.  Navarro then left, driving his SUV to pick up another friend.

## B.    The Collision

Around 9:00 p.m. or 9:30 p.m., the Awaida family was walking home on Country Club Drive in Long Beach after enjoying an evening of trick or treating and visiting with family.  Omar was in a stroller.  Halloween is a big festival in the neighborhood, and it is busy from around 6:00 p.m. until the later hours of the night.  Thus, a number of other people were also outside in the neighborhood and witnessed what Navarro did.

Navarro's SUV, the only car seen driving on the street before the collision, was traveling between 60 and 80 miles per hour on Country Club Drive, in violation of the 30-miles-per-hour speed limit.  Navarro did not stop for stop signs at two cross streets near an elementary school and a public park.  As he moved through the neighborhood he did not slow down and instead kept accelerating.  When the SUV came to a bend in the road, Navarro failed to turn, drove onto the sidewalk adjacent to the public park, and hit the Awaida family.  The impact from the collision flung all three family members 40 to 50 feet into the air.  Joseph and Raihan eventually landed in a cross street.  Omar came to rest under a car parked across that same cross street.  All three died very shortly after being hit.

Based on photos of the tire marks at the scene and surveillance video, a detective specializing in traffic collisions testified that Navarro's SUV was traveling between 62.3 and 68.8 miles per hour at the time he drove into the Awaida family.  The detective further opined that when Navarro approached the bend in the road, Navarro could not make the turn because of the high

4

speed at which his SUV was moving. The detective could not determine whether Navarro had tried to brake before the collision. Another officer with expertise in automobiles inspected Navarro's SUV and found it had no mechanical issues that would have affected its operation before Navarro killed Joseph, Raihan, and Omar.

After Navarro struck the Awaida family, he continued to drive off the street and along the sidewalk bordering Los Cerritos Park, where his SUV hit signs and knocked a water fountain encased in cement off its foundation. He finally stopped when he reached a perpendicular cross-street at the end of the park. A crowd gathered. Navarro got out of his SUV, began pacing, and then sat down. When asked, Navarro acknowledged he was the driver of the SUV.

Eyewitnesses described Navarro as smelling of alcohol, having slurred speech, and unsteady while both walking and sitting. After the collision, police found no open containers of alcohol in the SUV. They did, however, recover an unopened bottle of vodka from the lower center console and an unopened bottle of beer from a storage area behind the back seat.

Security footage taken from a nearby house and played for the jury depicted Navarro's SUV driving immediately before the collision, the collision itself, and the aftermath; because it was dark out, these images are not very well lit. The jury also saw police body camera video taken immediately following the collision by an officer responding to the scene, and photographs of the scene right after the crash.

C. **Navarro's Intoxication**

At about 11:20 p.m. that night, Officer Eric Stachura administered three different sobriety tests on Navarro, all of

which indicated that Navarro was impaired due to alcohol consumption. Navarro also had red, watery eyes, his speech was slurred, and he smelled of alcohol. Navarro acknowledged that he was drunk while driving and that he hit someone with his SUV.

During a physical examination at a hospital several hours after the crash, Navarro consented to a blood draw, which reflected Navarro had a blood alcohol level of 0.113 percent as of 1:45 a.m. A police criminalist estimated, based on certain assumptions about when Navarro had his last drink, that Navarro's blood-alcohol level at the time of the crash was approximately 0.17 percent. It would take about seven and a half drinks for a person Navarro's size to reach that blood alcohol level. Based on a hypothetical mirroring the evidence presented, Officer Stachura opined that the driver in the hypothetical was impaired to the point that he could not operate a car safely.

## D.    The Awaida Family's Injuries and the Causes of Death

A police officer who responded to the scene of the crash testified as to his observations of Joseph and Raihan's injuries; the officer was unable to fit under the car where Omar had become wedged to observe the extent of the child's injuries.

Medical examiners testified to the causes of death and each victim's injuries as they related to the cause of death. While testifying about the injuries and cause of death, the medical examiners used autopsy photographs to illustrate their testimony. Joseph suffered multiple injuries all over his body, including a nearly severed leg. Nearly all his injuries were on the left side of his body, indicating where Navarro's SUV hit him. Joseph died from blunt force trauma that resulted in bleeding in

6

his brain and chest. Raihan suffered multiple injuries all over her body, and died from blunt force trauma that resulted in a direct injury to her brain as well as lacerations to her liver, spleen, and kidneys. Omar suffered multiple injuries all over his body, including a fracture to the frontal bone in his head, and died from blunt force trauma that resulted in a brain hemorrhage and a lacerated spleen.

## E. Navarro's Pre-driving Knowledge of the Dangers of Alcohol

### 1. *May 2019 Police Encounter*

Navarro had an encounter with the Long Beach Police Department approximately five months before the collision. On May 8, 2019, police responded to a report of a person sleeping in a car blocking an alley and found Navarro "passed out" in the driver's seat. Navarro's car keys were in the center console. Navarro did not initially respond to commands from police to wake up. He had watery and bloodshot eyes and smelled of alcohol. Intoxilyzer tests done that night reflected blood alcohol levels of 0.117 percent and 0.114 percent. Police arrested Navarro for being drunk in public. During an interview with police, Navarro stated he thought he was too drunk to drive that night, and therefore slept in his car without realizing his car was blocking an alley.

### 2. *School Instruction*

A former instructor at a school Navarro attended as a teenager testified that she taught a life and job skills course that included a two-week drug unit. The unit typically included at least one day discussing alcohol, including the dangers of driving after consuming alcohol. Navarro took the course in 2016. The

instructor could not recall what she specifically taught in 2016, but believed that she "would almost be sure" that she covered the dangers of drinking and driving. She could not say if Navarro had been in class the day that alcohol was discussed assuming it had been. Navarro scored 100 percent on the drug unit test, but the test did not include any questions about the dangers of drinking and driving.

### 3. *Statements to Investigators*

In an interview several days after the collision, police and prosecutors questioned Navarro about his knowledge of the dangers of drinking and driving. Navarro was asked whether "that night [of the collision] . . . [he] knew . . . the dangers of drinking" and more specifically whether he was "aware that if you were to drink, and . . . get behind the wheel of a car, you could kill someone." He responded "Yes" to both questions.

Navarro also stated during this interview that he did not recall any classes in school on drinking and driving. Navarro did recall that the dangers of drinking and driving were discussed in the booklet he read when he applied for his driver's license. In addition, when Navarro was 18 years old, he saw a crashed car and a sign near Long Beach City College that talked about not drinking and driving. When asked to explain what he knew about drinking and driving, Navarro said that a driver "could get in trouble" if he or she had a blood alcohol level of "over 0.8," by which he presumably meant .08 percent. When asked to clarify whether one could "[j]ust get in trouble" or whether "things could be worse," Navarro responded that he "really didn't think about hitting someone" but rather "was just thinking that you could get in a crash."

## DISCUSSION

### A.    Sufficiency of the Evidence of Implied Malice

Navarro argues there is no substantial evidence that he acted with implied malice sufficient to support his second degree murder conviction.[3]  "[A] conviction for second degree murder, based on a theory of implied malice, requires proof that a defendant acted with conscious disregard of the danger to human life." (*People v. Knoller* (2007) 41 Cal.4th 139, 156.)  Acting with "conscious disregard of the risk of serious bodily injury" does not suffice.  (*Ibid.*)  "[I]mplied-malice murder has a physical component: an act whose natural consequences are dangerous to life.  And it has a mental component: [the] defendant's deliberate performance of the act with conscious disregard for life, knowing the act endangers another's life.  [Citation.]  The mental component calls for a subjective inquiry into a defendant's state of mind and requires 'a determination that the defendant actually appreciated the risk involved, i.e., a subjective standard.' (*People v. Watson* (1981) 30 Cal.3d 290, 296-297 . . . .)" (*In re Ferrell* (2023) 14 Cal.5th 593, 604, italics omitted.)

In *People v. Watson*, *supra*, 30 Cal.3d 290 (*Watson*), our Supreme Court reversed an order dismissing second degree murder charges in a criminal information charging both manslaughter and murder based on the same fatal incident of drunk driving.[4]  In so doing, the court held that "a defendant may

---

[3] Navarro does not contest his convictions for vehicular manslaughter.

[4] "At the preliminary examination, the magistrate [had] found probable cause to charge [the] defendant with vehicular manslaughter, but refused to hold him to answer the second

9

be charged with second degree murder upon facts which also would support a charge of vehicular manslaughter" (*id*. at p. 299), and further concluded that "[t]he circumstances of the offense, as elicited at the preliminary examination" (*id*. at p. 293) "imply malice and therefore justify charging . . . second degree murder." (*Id*. at p. 300.) The court noted the following specific circumstances in reaching this conclusion: "[The d]efendant had consumed enough alcohol to raise his blood alcohol content to a level which would support a finding that he was legally intoxicated. He had driven his car to the establishment where he had been drinking, and he must have known that he would have to drive it later. It also may be presumed that [the] defendant was aware of the hazards of driving while intoxicated.[5] . . . [The

---

degree murder counts, concluding that the facts elicited at the preliminary examination were insufficient to demonstrate the essential element of implied malice. Despite the magistrate's ruling, the People included in the information the two counts of second degree murder which were rejected by the magistrate." (*Watson, supra*, 30 Cal.3d at p. 294.) The defendant successfully moved to dismiss the murder counts, and the People appealed from the order of dismissal. (*Ibid*.)

[5] The *Watson* court explained this presumptive knowledge by stating: " 'One who wilfully consumes alcoholic beverages to the point of intoxication, knowing that he thereafter must operate a motor vehicle, thereby combining sharply impaired physical and mental faculties with a vehicle capable of great force and speed, reasonably may be held to exhibit a conscious disregard of the safety of others.' " (*Watson, supra*, 30 Cal.3d at pp. 300-301.) Other language in *Watson*, as well as subsequent Supreme Court decisions, clarify that implied malice requires actual awareness of the risk of death. (See, e.g., *In re Ferrell,*

d]efendant drove at highly excessive speeds through city streets, an act presenting a great risk of harm or death. [The d]efendant nearly collided with a vehicle after running a red light; he avoided the accident only by skidding to a stop. He thereafter resumed his excessive speed before colliding with the victims' car, and then belatedly again attempted to brake his car before the collision . . . suggesting an actual awareness of the great risk of harm which he had created. In combination, these facts reasonably and readily support a conclusion that [the] defendant acted wantonly and with a conscious disregard for human life." (*Watson, supra*, 30 Cal.3d at pp. 300-301.)

*Watson* cautioned that it was "neither contemplat[ing] nor encourag[ing] the routine charging of second degree murder in vehicular homicide cases," and further that it was "not suggest[ing] that the foregoing facts conclusively demonstrate implied malice, or that the evidence necessarily is sufficient to convict [the] defendant of second degree murder." (*Watson, supra*, 30 Cal.3d at p. 301.) Rather, the court described its holding as "merely determin[ing] that the evidence before [it was] sufficient to uphold the second degree murder counts in the information, and to permit the prosecution to prove, if it [could], the elements of second degree murder." (*Ibid.*)

In reviewing Navarro's challenge to the sufficiency of the evidence to support implied malice under a *Watson* murder theory, "we 'review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of

---

*supra,* 14 Cal.5th at p. 604; *Watson, supra*, 30 Cal.3d at pp. 296-297.)

11

solid value—from which a reasonable trier of fact could find . . . beyond a reasonable doubt' " that Navarro acted with implied malice.  (*People v. Saucedo* (2023) 90 Cal.App.5th 505, 512.)  In so doing, we conclude that the record contains sufficient evidence to support the jury's finding.

Navarro argues that in the prototypical *Watson* murder case the defendant has prior convictions for drunk driving and/or the defendant had been expressly cautioned as to the risk of killing someone while driving under the influence.  (See, e.g., *People v. Murphy* (2022) 80 Cal.App.5th 713, 730 [evidence of "multiple warnings about the dangers of driving while under the influence of controlled substances," including that the defendant "signed a driver's license application affirming he had been advised that driving under the influence of alcohol or drugs could lead to a murder charge"]; *People v. Autry* (1995) 37 Cal.App.4th 351, 359 [sufficient evidence of implied malice based on, inter alia, evidence of four prior drunk driving convictions, the defendant's participation in a program in which residents "were *constantly* 'bombarded' with horror stories of the dangers and consequences of drunk driving" and passengers "desperately [having] warned [the defendant], at the very time of driving, that [he] was driving dangerously and should let [someone else] drive because they did not want to be killed"]; *People v. McCarnes* (1986) 179 Cal.App.3d 525, 532 [four drunk driving convictions, two of which required the defendant's participation in drunk driving educational programs].)  Here, Navarro did not have a prior drunk driving conviction and there was no evidence that he was expressly cautioned as to the risk of death in driving while intoxicated.

The lack of such evidence, however, is not dispositive because *Watson* " 'deliberately . . . require[ed] a case-by-case approach' " to assessing implied malice. (*People v. Johnigan* (2011) 196 Cal.App.4th 1084, 1091, quoting *People v. Olivas* (1985) 172 Cal.App.3d 984, 989.) We thus look to the specific evidence here and consider whether, in light of the principles reflected in *Watson*, the jury could have reasonably found that Navarro acted with conscious disregard for human life, knowing that his actions endangered another's life.

As in *Watson*, Navarro was driving with a blood alcohol level well above the legal limit. Because Navarro was under the age of 21, his legal blood alcohol limit was under 0.01 percent. (Veh. Code, § 23136.) The criminologist estimated Navarro's level to be 0.17 percent—approximately 17 times the legal limit, and more than double the limit for someone of legal drinking age—and it was in any event no lower than 0.113 percent. As to pre-drinking intent to drive while drunk, Navarro drove to an abandoned golf course after purchasing liquor and drank the alcohol there, such that the jury could reasonably infer he intended to drive away from the golf course afterwards (as he in fact did).

Navarro drove his SUV between approximately 30 to 40 miles per hour over the speed limit down a residential street on Halloween evening when people were out walking. He did not slow down but instead continued to accelerate. He flew through multiple stop signs without stopping. He was moving at such a high speed that he lost control and drove onto the sidewalk. The evidence further showed Navarro was driving at such a high speed and with such a conscious disregard to human life that when he hit the Awaida family, he flung them into the air with

such force that he inflicted horrific injuries that killed all three of them. Navarro then continued to drive along the sidewalk—where thankfully no one else was still in his path—hitting signs and toppling a concrete water fountain before finally stopping. These types of actions presenting a great risk of harm or death are well within the ambit of prior cases applying *Watson*. (See, e.g., *People v. Saucedo, supra*, 90 Cal.App.5th at p. 513 [the defendant "accelerat[ed] down the exit ramp" and "careen[ed] through a red light without attempting to brake" while intoxicated]; *People v. Murphy, supra*, 80 Cal.App.5th at p. 730 [the defendant drove through a red light at more than double the applicable speed limit in a residential neighborhood without braking or honking the car horn"]; *People v. Wolfe* (2018) 20 Cal.App.5th 673, 679, 684 [the defendant veered off the street, struck a pedestrian standing by the side of the road, and continued driving].)

Finally, Navarro's 2019 encounter with police showed that he knew it was too dangerous to drive while intoxicated such that he tried to sleep it off before doing so. He also admitted to police that he was aware before he started to drive away from the golf course and towards the Awaida family "that if you were to drink, and . . . get behind the wheel of a car, you could kill someone." Such evidence showed that Navarro "must have known [alcohol] affected his decisionmaking and ability to concentrate. [Citations.] The jury could reasonably infer that by getting behind the wheel while [intoxicated from alcohol] and then attempting such . . . risky" driving maneuvers as he did in a neighborhood with families and friends out trick or treating that Navarro "was acting ' " 'with conscious disregard for life.' " ' [Citation.]" (*People v. Saucedo, supra*, 90 Cal.App.5th at p. 513.)

14

Navarro points out that he did not attend educational courses on the dangers of drunk driving, he did not flee the scene and was cooperative and apologetic after the incident, he was 20 years old at the time, and there was no evidence that he had been previously involved in any prior "near-misses." He further argues that his statement that he knew that one can kill another if they drink and drive should be viewed together with other statements to the police that he "really didn't think about hitting someone," but rather "was just thinking that you could get in a crash." The weight of such evidence versus the facts favoring conviction we have recited was for the jury to determine. Although we review the "entire record" to determine whether there is substantial evidence to support the jury's verdict, we do not reweigh the evidence. (*People v. Albillar* (2010) 51 Cal.4th 47, 60.) "If the circumstances reasonably justify the trier of fact's findings," as they do here, we will not reverse the judgment "simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Ibid.*)

## B. The Trial Court's Evidentiary Rulings Do Not Mandate Reversal

Navarro also asserts we should reverse his murder convictions because the court prejudicially abused its discretion when making several evidentiary rulings. As to some of this evidence, Navarro waived any claim of error because he did not object to its admission during his trial. As to the rulings he did preserve for appeal, Navarro argues the court erred in admitting autopsy photographs of injuries suffered by Reihan and Omar, in refusing to admit evidence that he asked for permission to take a knee and pray for his victims after he was taken into custody, and in admitting evidence that the center console of the car in

15

which he was found drunk and asleep in May 2019 contained shotgun shells. As explained below, we find no reversible error in these rulings.

1. *Admitted Evidence to Which Navarro Did Not Object at Trial*

On appeal, Navarro objects to the court's admission of autopsy photographs showing Joseph's injuries, video from a body-worn camera on an officer responding to the scene, and photographs of the area around the crash showing various objects identified by numbered crime scene placards. Navarro acknowledges his trial counsel did not object to any of this evidence at trial. As to each of these challenged pieces of evidence, "[b]ecause he failed to make an appropriate objection, the issue is waived. (Evid. Code, § 353, subd. (a).)" (*People v. Bolin* (1998) 18 Cal.4th 297, 320.)

Navarro argues his trial counsel was ineffective for failing to object, and we therefore should excuse this waiver and reach his claims on direct appeal. Our Supreme Court has "repeatedly emphasized that a claim of ineffective assistance is more appropriately decided in a habeas corpus proceeding," where evidence can be presented regarding the reasons for counsel's tactical decisions, and not on direct appeal. (*People v. Michaels* (2002) 28 Cal.4th 486, 526.) In accord with that guidance, we decline to address Navarro's ineffective assistance of counsel claims on direct appeal. We find such deference particularly appropriate here as Navarro does not suggest his counsel was ineffective for failing to object to the admission of testimony from the medical examiner who described Joseph's injuries independent of the photographs, testimony from the responding officer about what he observed independent of the body-worn

16

camera corroborating his testimony, or testimony from a police officer who introduced diagrams showing the path of Navarro's SUV from the point it drove onto the sidewalk until it stopped that relied on the photographs showing the location of various objects at the crime scene.

2.    *The Autopsy Photographs of Raihan and Omar*

a.    The Photographs and Related Testimony

Deputy medical examiner Matthew Miller examined the bodies of Raihan and Omar. Miller testified that Omar died from blunt force traumatic injuries. Miller further testified without objection that the injuries leading to Omar's death included a fracture of the left frontal bone in his head, accompanied by a skin laceration in the same area. Both bones in Omar's left forearm were broken, as was his pelvis. The prosecution then introduced five photographs depicting the injuries to which Miller had just testified: three pictures of Omar's injured face (one from the front, one from the left side, and one from the right side), one picture of his broken left arm, and one picture of his fractured right leg. Navarro objected to the photographs; the court overruled the objection stating "[t]here's an evidentiary purpose for it."

Miller testified Raihan also died of blunt force traumatic injuries. He testified without objection that the injuries Raihan suffered leading to her death included bleeding around the brain, and lacerations of the liver, spleen, and kidney along with associated bleeding. She also had a broken left arm where the broken bone went through her skin, and a fractured ankle. The prosecution then introduced five photos of Raihan depicting the injuries Miller had just described, each of which showed a

17

different injury. Navarro again objected, and the court again overruled the objection.

>               b.      The Court Did Not Abuse Its Discretion Under Evidence Code Section 352

Navarro argues the court erred in admitting these autopsy photographs, citing Evidence Code section 352. He argues the photographs had little to no relevance to any issue in dispute, and their prejudicial effect thus outweighed their minimal probative value. He further argues that absent admission of these photographs, there is a reasonable probability the jury would not have convicted him of murder, justifying reversal of his convictions for that crime.

In murder cases, courts are "often asked to rule on the propriety of the admission of allegedly gruesome photographs. [Citations.] At base, the applicable rule is simply one of relevance, and the trial court has broad discretion in determining such relevance. [Citation.] ' "[M]urder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant" ' [citations], and we rely on our trial courts to ensure that relevant, otherwise admissible evidence is not more prejudicial than probative (Evid. Code, § 352). A trial court's decision to admit photographs under Evidence Code section 352 will be upheld on appeal unless the prejudicial effect of such photographs clearly outweighs their probative value. [Citation.] Finally, prosecutors, it must be remembered, are not obliged to prove their case with evidence solely from live witnesses; the jury is entitled to see details of the victims' bodies to determine if the evidence supports the prosecution's theory of the case. [Citations.]" (*People v. Gurule* (2002) 28 Cal.4th 557, 624.)

18

No one disputes the photographs demonstrated the cause of Raihan and Omar's deaths. Navarro and our dissenting colleague nevertheless claim the photographs had low probative value on this point because they were cumulative of other evidence such as medical examiner testimony, and because the cause of death was not contested at trial. But "[t]he prosecution was not obliged to prove these details solely from the testimony of live witnesses, and the jury was entitled to see how the physical details of the scene and body supported the prosecution theory of murder . . . ." (*People v. Turner* (1990) 50 Cal.3d 668, 706.) Photographs that corroborate and clarify a medical examiner's testimony regarding the cause of death and condition of a victim's body, as these photographs did, have long been held to have meaningful probative value and to be noncumulative. (E.g., *People v. Mendoza* (2000) 24 Cal.4th 130, 171 [photograph of charred murder victim relevant because it corroborated testimony of coroner "regarding the cause of death and condition of the body"]; *People v. Scheid* (1997) 16 Cal.4th 1, 19 ["insofar as [the] defendant is contending that the trial court was required to exclude the photograph under Evidence Code section 352 because [it] was cumulative of the testimonial evidence presented, the trial court correctly rejected [the] defendant's argument"]; *People v. Wilson* (1992) 3 Cal.4th 926, 938 [" '[w]e have often rejected the argument that photographs of a murder victim should be excluded as cumulative if the facts for which the photographs are offered have been established by testimony' "].) The photographs here corroborated the medical examiner's testimony by showing the injuries to which he testified. Each picture showed a different injury; none was repetitive. "In these circumstances, a picture could be worth a thousand words; the images were not

simply cumulative of other testimony." (*People v. Duff* (2014) 58 Cal.4th 527, 557.)

Navarro's decision not to contest the cause of death similarly did not reduce the photographs' probative value. His decision not to dispute the cause of death did not relieve the prosecution of its burden to prove that fact beyond a reasonable doubt. "[A]utopsy . . . photographs are not made inadmissible because they are offered to prove an issue not in dispute." (*People v. Watson* (2008) 43 Cal.4th 652, 684.) "[T]he absence of a defense challenge to particular aspects of the prosecution's case or its witnesses does not render victim photographs irrelevant." (*People v. Lewis* (2001) 25 Cal.4th 610, 641.)

In addition to demonstrating the cause of death was the injuries inflicted by Navarro when he hit Raihan and Omar, the extent of the victims' injuries was probative of implied malice. Photographs about the nature of the victims' injuries "made it much easier to visualize" the level of disregard Navarro showed to the life of his victims. (*People v. Duff, supra*, 58 Cal.4th at p. 557.) The dissent does not directly dispute the photographs' relevancy to implied malice but concludes their probative value on this issue was "minimal at best" for two reasons. First, it asserts the photographs were cumulative of other evidence. As explained above, our Supreme Court has repeatedly rejected this assertion. (E.g., *People v. Mendoza, supra*, 24 Cal.4th at p. 171; *People v. Scheid, supra*, 16 Cal.4th at p. 19; *People v. Wilson, supra*, 3 Cal.4th at p. 938.)

Second, the dissent claims evaluating the photographs' probative value as to implied malice "necessarily involves two steps . . . : (1) the more extensive the injuries a victim sustains in a car accident, the more likely it is that the driver causing those

20

injuries was driving in a highly dangerous manner; and (2) when a driver is driving in a highly dangerous manner, it is more likely he is aware that his driving poses a risk to human life." The dissent then proceeds to cast doubt on both these purported steps, as well as case law citing a defendant's dangerous driving as a factor in assessing implied malice.

Contrary to the dissent's proposed test of probative value, implied malice is not limited to what is in a defendant's head. "The concept of implied malice has both a physical and a mental component. [Citation.] The physical component is satisfied by the performance of ' "an act, the natural consequences of which are dangerous to life." ' [Citation.] The mental component . . . involves an act ' "deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' " (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 106-107.) As previously discussed above, *Watson* itself recognizes these twin components. (*Watson*, *supra*, 30 Cal.3d at p. 300 ["malice may be implied when [the] defendant does an act with a high probability that it will result in death *and* does it with a base antisocial motive and with a wanton disregard for human life," italics added].)

*Watson* and cases that have followed it recognize that a defendant's highly dangerous driving is one of the facts that in combination with other evidence can "reasonably and readily support a conclusion that [the] defendant acted wantonly and with a conscious disregard for human life." (*Id.* at p. 301; see also *People v. Murphy*, *supra*, 80 Cal.App.5th at p. 727 [noting factors for assessing implied malice under *Watson* include " 'highly dangerous driving' "]; *People v. Wolfe*, *supra*, 20 Cal.App.5th at

21

p. 683 [same]; *People v. Autry*, *supra*, 37 Cal.App.4th at p. 358 [same].)

Photographs of the victims' injuries were therefore probative of the physical component of implied malice. The severity of the injuries Raihan and Omar suffered showed how wantonly Navarro was acting when he inflicted those injuries. The dissent does not and frankly cannot dispute this correlation in the case before us, and focuses instead on other potential hypothetical scenarios where such a relationship may not exist. Needless to say, we decide the case before us and not one of those hypotheticals.

Given that the photographs had meaningful probative value on the physical component of implied malice, they did not need also to demonstrate the mental component of implied malice. Even so, they did. The dissent posits "there is at best an attenuated connection between how dangerously one is driving and whether one is aware that such driving poses a risk not just of injury or accident, but of death specifically." Case law has drawn the opposite conclusion, indicating that the extent of Navarro's highly dangerous driving "further supported a jury inference that he knew he . . . was aware of the danger to human lives, and deliberately proceeded in conscious disregard of that risk." (*People v. Murray* (1990) 225 Cal.App.3d 734, 747.) For example, in *People v. Moore* (2010) 187 Cal.App.4th 937, the defendant drove 70 miles per hour in a 35-mile-per-hour zone, ran a red light, crossed out of the traffic lane going in his direction, and struck someone without even attempting to apply his brakes (*id.* at p. 941)—facts similar to those before us. The *Moore* court found these actions showed as to the physical component of implied malice that the defendant "acted with

22

wanton disregard of the near certainty that someone would be killed." (*Ibid*.) They also showed the mental component of implied malice: "Whether [the defendant] was subjectively aware of the risk is best answered by the question: how could he not be? It takes no leap of logic for the jury to conclude that because anyone would be aware of the risk, [the defendant] was aware of the risk" posed by his driving. (*Ibid*.)

Citing *In re Ferrell*, *supra*, 14 Cal.5th at page 604, the dissent intimates our high court has prohibited drawing any inferences as to the mental component of implied malice from the physical component. That is not what *In re Ferrell* states, and the dissent identifies no court that has so held. *In re Ferrell* analyzed not a *Watson* murder theory but the prejudicial impact of erroneous jury instructions in a case where the defendant discharged a firearm. *In re Ferrell* reiterated that "[i]mplied malice requires proof of both a physical act and a mental state" and that proof of one without the other is insufficient. (*Id*. at pp. 600, 604.) *In re Ferrell* does not say that one cannot consider proof of the physical component of implied malice when evaluating the mental component, nor did it overrule the many cases that have done exactly that. Indeed, *In re Ferrell* itself evaluated what inferences could be drawn as to the mental component of implied malice from the defendant's firing of a gun in concluding the People had not shown the instructional error was harmless. (*Id*. at pp. 604-608.)

Given the relevance of the photographs to multiple issues on which the People carried the burden of proof, the court did not abuse its discretion in determining their probative value outweighed the possibility of there being a substantial danger of undue prejudice, and in admitting the evidence. "To establish an

23

abuse of discretion, defendants must demonstrate that the trial court's decision was so erroneous that it 'falls outside the bounds of reason.' [Citations.] A merely debatable ruling cannot be deemed an abuse of discretion. [Citations.] An abuse of discretion will be 'established by "a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' [Citation.]" (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 390.) In our view, the arguments of Navarro and the dissent do not satisfy this standard. Indeed, the only case cited by Navarro and the dissent which found error in the admission of autopsy photographs is a 50-year-old opinion in which the pictures' depiction of the injuries was "heightened by vivid coloration" (*People v. Smith* (1973) 33 Cal.App.3d 51, 69, disapproved on another ground in *People v. Wetmore* (1978) 22 Cal.3d 318, 324, 327, fns. 5 & 7), something that did not occur here. Even there, however, the *Smith* court found the "error nevertheless did not cause a miscarriage of justice and furnishes no ground for reversal." (*People v. Smith*, *supra*, at p. 69.)

When evaluating prejudice, we must keep in mind that " 'all evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Karis* (1988) 46 Cal.3d 612, 638.) Here, the disputed images did not constitute a blatant appeal to the jury's emotions distinct from evidence that fairly depicted the

24

horror that Navarro himself perpetrated; they " 'did not disclose to the jury any information that was not presented in detail through the testimony of witnesses,' and they were 'no more inflammatory than the graphic testimony provided by a number of the prosecution's witnesses.' [Citation.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1199.)

       3.     *Evidence of Concern for Victims After the Fact*

Evidence was admitted that after the collision, Navarro stayed at the scene and did not attempt to flee. Witnesses also testified that Navarro appeared to be in shock and was remorseful and apologetic.

In addition to this testimony, Navarro sought to introduce evidence through police officers that several hours after his arrest, while in police custody and waiting at the hospital for a blood draw, he asked for permission to kneel and pray for his victims. Navarro argued this evidence was relevant to whether he acted with conscious disregard of human life at the time of his offenses. The trial court ruled this evidence was both hearsay and irrelevant to whether Navarro acted with conscious disregard of human life but might become relevant and admissible if Navarro testified. Navarro ultimately decided not to testify in his own defense.

We need not address whether this evidence was subject to a hearsay rule exception because even if it was, the evidence was irrelevant. Navarro cites three cases in support of his argument that this evidence was relevant to his mens rea, but none is apposite. In all three cases, evidence was admitted about the defendants' actions after their endangering acts but before their victims died. (*People v. Cravens* (2012) 53 Cal.4th 500, 505, 511; *People v. Latham* (2012) 203 Cal.App.4th 319, 330-331; *People v.*

*Ogg* (1958) 159 Cal.App.2d 38, 51.)  The defendants' indifference to the plight of their victims while those victims were still alive was relevant to show the defendants' conscious disregard of human life.  (*People v. Cravens*, *supra*, at p. 511; *People v. Latham*, *supra*, at p. 332; *People v. Ogg*, *supra*, at p. 51.)  Here, in contrast, Navarro had already killed the Awaida family hours before the time he asked to take a knee and pray.  His belated request to pray for people he had already killed thus had no relevance to whether he acted with conscious disregard of human life when Joseph, Raihan, and Omar were still alive and capable of being helped.  As the proffered evidence was irrelevant, the trial court did not err in excluding it.

      4.    *Shotgun Shells*

One of the officers who spoke to Navarro in connection with the May 2019 incident testified at trial regarding a video of that encounter.  At one point in the video, while Navarro is still inside the car, the officer grabs a box from the center console and then slams the console shut.  The officer then quickly ordered Navarro out of the vehicle.  To explain this sequence of events, the prosecutor asked the officer what was in the box, and the officer responded it contained shotgun shells.  The officer was asked why he then ordered Navarro out of the car, and the officer responded that based on the shotgun shells he was concerned there might be a weapon inside the car.  The officer then clarified that no weapon was later found inside the vehicle.

Before this testimony, the court admonished the jury that evidence regarding the May 2019 encounter was being introduced for the limited purpose of determining Navarro's intent as it related to conscious disregard for human life on the day of the crash and not to show his bad character or predisposition to

26

commit crimes.  After this testimony, the court instructed the jury that it was not illegal to possess shotgun shells, and that testimony on this point was admitted only to explain why the officer reacted so quickly.

Navarro argues this evidence was irrelevant because there was no need to explain the officer's actions, and that the error (either considered alone or in combination with other alleged evidentiary errors) was prejudicial.  This evidence had some limited probative value; without this explanation, the officer's actions would have been confusing and potentially undermined his credibility.  Although the probative value of this brief testimony was low, the court did not abuse its discretion in admitting the evidence particularly given the admonitions it gave before and after the testimony to mitigate any undue prejudice. (*People v. Burgener* (2003) 29 Cal.4th 833, 869-870 ["Inasmuch as the jury was promptly and correctly instructed as to the limited purpose of the evidence, we cannot say that the trial court abused its discretion under Evidence Code section 352 in allowing the testimony"].)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED

WEINGART, J.

I concur:

BENDIX, J.

27

ROTHSCHILD, P. J., Dissenting.

Although, in my view, the evidence supporting implied malice is close, it is nonetheless sufficient to survive scrutiny under the deferential substantial evidence standard of review.

I write separately to address Navarro's argument that the court abused its discretion in overruling his Evidence Code section 352 objections to the autopsy photographs of Raihan Awaida and her 3-year-old son, Omar Awaida. As a result of this ruling, the jury saw five photographs of Omar's battered body: a close up of the child's injured face with a long line of suturing down the center of his forehead; other close-up images of his face highlighting abrasions and bruising; an image of his bandaged and bloody left arm and his left hand; and an image of his fractured right leg. The jury also saw five photos of Raihan, including a close-up of her face with extensive bruising, cuts and abrasions, and an image of her fully nude, extensively bruised body with a wrapped right leg, exposing her pubic area and one breast.

" ' "A trial court's decision to admit photographs [challenged] under Evidence Code section 352 will be upheld on appeal unless the prejudicial effect of such photographs clearly outweighs their probative value." ' " (*People v. Duff* (2014) 58 Cal.4th 527, 557 (*Duff*).) Navarro argues the court reversibly erred in admitting these photographs, because they were not relevant to any issue in dispute, and thus had at best minimal probative value, yet posed an overwhelming risk that they would inflame the passions of the jury. (Evid. Code, § 352.) I agree that at most they had minimal probative value but were highly prejudicial. I would thus reverse Navarro's murder convictions on this basis.

In assessing the probative value of the autopsy photographs, the majority points primarily to their relevance in proving the causes of the victims' deaths. Cause of death was not in meaningful dispute at trial, and the prosecution presented other evidence, including the detailed testimony of the medical examiner, establishing Raihan and Omar died as a result of the collision with Navarro's vehicle.

The majority notes that the prosecution was entitled to present multiple types of evidence (i.e., both photographs and testimony) to prove cause of death, and that a defendant should not be permitted to avoid the full force of the evidence by conceding an element of the crime can be proven. But that cumulative evidence regarding points not in dispute is not automatically excludable does not mean such evidence always has sufficient probative value to withstand its prejudice. To the contrary, the cumulativeness of evidence can, and here does, decrease the probative value of photographic evidence in an Evidence Code section 352 analysis. (See *People v. Gurule* (2002) 28 Cal.4th 557, 625 [ "[t]he fact that the photographic evidence may have been cumulative to other evidence does not render it inadmissible [citation], . . . [but] the trial court should [nevertheless] consider [cumulativeness] when ruling on a motion to exclude evidence pursuant to Evidence Code section 352"]; see also *People v. Cardenas* (1982) 31 Cal.3d 897, 905 [" '[t]he prosecution has no right to present cumulative evidence which creates a substantial danger of undue prejudice to the defendant' "].) Considering that these photographs offered mere visual support for the causes of death to which the medical examiner had already testified in detail, and that there was no dispute at trial that Navarro's driving into the Awaida family

2

caused their deaths, the probative value of the photographs on this point was extremely low.

The majority notes that "[i]n addition to demonstrating the cause of death . . . , the extent of the victims' injuries was probative of implied malice" because "[p]hotographs about the nature of the victims' injuries 'made it much easier to visualize' the level of disregard Navarro showed to the life of his victims." (Maj. opn. *ante*, at p. 20.) The reasoning underlying this theory of relevance necessarily involves two steps. Namely: (1) the more extensive the injuries a victim sustains in a car accident, the more likely it is that the driver causing those injuries was driving in a highly dangerous manner; and (2) when a driver is driving in a highly dangerous manner, it is more likely he is aware that his driving poses a risk to human life.

The majority's reasoning builds one shaky theory of relevance upon another. First, the photos are cumulative of other evidence on both of these two points. The surveillance camera footage of the accident and expert and percipient witness testimony regarding speed already support that Navarro was speeding and drove onto a curb, and that his driving was generally erratic and dangerous. And the medical examiner's testimony already speaks to the extent of Omar's and Raihan's injuries. As noted above, cumulativeness is a valid consideration in evaluating probative value for the purposes of Evidence Code section 352.

Second, it is not necessarily true that the extent of the injuries inflicted in a collision correlates with how dangerously the driver was driving. Although it is possible such a correlation may exist under certain circumstances, numerous other factors

3

can play into the extent of injury, rending this logical connection between serious injuries and more dangerous driving weak.

Third, there is at best an attenuated connection between how dangerously one is driving and whether one is aware that such driving poses a risk not just of injury or accident, but of death specifically. (See *People v. Knoller* (2007) 41 Cal.4th 139, 156 [acting with "conscious disregard of the risk of serious bodily injury" does not suffice to establish implied malice].) The connection is particularly attenuated when the individual in question is intoxicated. Further, the logic that a driver is more likely aware of the mortal risk his driving poses if his driving is highly dangerous—or, more specifically here, if he is speeding and driving onto the sidewalk—is in tension with our state Supreme Court's description of implied malice. The high court has made clear that the prosecution cannot prove implied malice by establishing the conduct at issue is "inherently dangerous in the abstract or would appear risky to a reasonable person." (See, e.g., *In re Ferrell* (2023) 14 Cal.5th 593, 604.) Yet the majority's reasoning requires precisely such logic; namely, that because speeding and driving onto the sidewalk are inherently highly dangerous acts, it is more likely Navarro was aware that his driving in this manner posed a mortal threat.[1]

---

[1] I am aware that some cases appear to have accepted this reasoning and even cite " 'highly dangerous driving' " (*People v. Murphy* (2022) 80 Cal.App.5th 713, 727) as a factor in assessing implied malice that derives directly from *People v. Watson* (1981) 30 Cal.3d 290. (See, e.g., *Murphy, supra*, 80 Cal.App.5th at p. 727.) Without calling into question the outcomes of those cases on their unique facts, I note that, in *Watson*, the court considered the manner of the defendant's driving not on the

4

The majority's theory of relevance thus compounds two tenuous logical connections by inferring from the extent of the victims' injuries that Navarro drove dangerously, and then further inferring that Navarro's driving was so dangerous, Navarro must have known it posed a mortal risk. The tenuousness of this line of reasoning, its tension with broader concepts of implied malice, and the fact that it relies on the photographs to support inferences already established by other evidence, all render the photographs' probative value on implied malice minimal at best.

Thus, I conclude the probative value of the photographs on the issues at trial, including cause of death and implied malice, was extremely low.

The question then becomes whether the photographs had a prejudicial effect that " ' "clearly outweighs" ' " their low probative value. (*Duff, supra*, 58 Cal.4th at p. 557.) The " ' "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.' " (*People v. Karis* (1988) 46 Cal.3d 612, 638.) Evidence is prejudicial in this sense if it is "of such a nature as to overcome

_____

theory that he was driving so recklessly he must have been aware of a risk of death, but rather as follows: "Defendant nearly collided with a vehicle after running a red light; he avoided the accident only by skidding to a stop. He thereafter resumed his excessive speed before colliding with the victims' car, and then belatedly again attempted to brake his car before the collision . . . suggesting an actual awareness of the great risk of harm which he had created." (*Watson, supra*, 30 Cal.3d at p. 301.) Here, nothing about the manner of Navarro's driving suggests he was aware of mortal risk in the way described in *Watson*.

the jury's rationality" (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 212) and cause the jury to consider the evidence " 'for an illegitimate purpose.' " (*People v. Doolin* (2009) 45 Cal.4th 390, 439 (*Doolin*).)  Evidence can have such a prejudicial effect when it " 'create[s] a substantial danger of inflaming the jury's passions by engendering . . . feelings of sympathy.' " (*People v. Covarrubias* (2015) 236 Cal.App.4th 942, 950; see *Doolin, supra*, at p. 439.)

The autopsy photographs had such a prejudicial effect that " ' "outweigh[ed] their probative value." ' " (*Duff, supra*, 58 Cal.4th at p. 557.)  Although the testimony describing the victims' deaths under the tragic circumstances of this case is disturbing, the autopsy photographs are shocking. The photographs include, for example, images of a dead three-year-old child's face with thick black suturing running down the center of his forehead, and the severely battered face of his mother.  Some of the photographs are so close-up that the image of each face takes up virtually the entire space in a photograph, rendering them especially intimate and emotionally powerful.  And the image of the naked, severely bruised corpse of the mother with her breast and pubic hair visible evokes great anger.  (See *Doolin, supra*, 45 Cal.4th at p. 439.)

I disagree with the majority that the photographs had no more severe effect than the medical examiner testimony regarding the causes of death and victims' injuries.  As the majority notes with respect to other evidence, "a picture could be worth a thousand words." (*Duff, supra*, 58 Cal.4th at p. 557.) Testimony describing the injuries of a dead child simply does not have the same impact as images of a dead child—some close-up enough that the jury could notice small, intimate details about

his face and body. Nor can we justify this additional impact as necessary to provide additional insight into or support for the causes of death beyond that already established by the testimony. To the contrary, the photographs at best visually depict the injuries the medical examiner describes and cannot speak to whether those injuries were, in fact, the cause of death.[2] These photographs thus offer no *additional* information about the cause of death and serve only to upset and inflame the passions of the jury. " '[E]vidence should be excluded as unduly prejudicial when it . . . motivat[es] [the jury] to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction.' " (*Doolin, supra*, 45 Cal.4th at p. 439.) The photographs "supplied no more than a blatant appeal to the jury's emotions. . . . The trial court erred in admitting them." (*People v. Smith* (1973) 33 Cal.App.3d 51, 69.)

I would reverse the murder convictions based on the court's abuse of discretion in admitting these photographs over Navarro's objection. Therefore, I respectfully dissent.


ROTHSCHILD, P. J.

---

[2] Indeed, some of the photographs depict injuries that, according to the medical examiner's testimony, did not contribute to the victims' deaths—such as injuries to Omar's arm or Raihan's leg.

7